#26823-a-DG

**2014 S.D. 51**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

DONOVAN CRAIG SIERS,                    Plaintiff and Appellant,

    v.

DOUGLAS WEBER, Warden of the
South Dakota State Penitentiary,        Respondent and Appellee.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE PETER H. LIEBERMAN
Judge

\* \* \* \*

MARK KADI
Minnehaha County Office
  of the Public Advocate
Sioux Falls, South Dakota            Attorneys for plaintiff
                                      and appellant.


MARTY J. JACKLEY
Attorney General

JEFFREY P. HALLEM
KELLY MARNETTE
Assistant Attorneys General
Pierre, South Dakota              Attorneys for respondent
                                      and appellee.

\* \* \* \*

ARGUED ON MARCH 25, 2014
OPINION FILED **07/23/14**

#26823

GILBERTSON, Chief Justice

[¶1.]        Petitioner and Appellant Donovan Siers filed a petition for habeas corpus alleging ineffective assistance of counsel.  The petition asserted that counsel in Siers's driving under the influence conviction failed to properly advise Siers of the constitutionality of blood evidence taken incident to lawful arrest but without Siers's consent.  The State moved to dismiss the petition for failure to state a claim upon which relief could be granted.  The habeas court granted the motion, but issued a certificate of probable cause regarding whether *Missouri v. McNeely*, ___ U.S. ___, 133 S. Ct. 1552, 185 L. Ed. 2d 696 (2013), should be given retroactive effect in South Dakota.  We affirm the habeas court's ruling and hold that *McNeely* is not given retroactive effect.

**FACTS**

[¶2.]        Appellant Donovan Siers filed an amended petition for habeas corpus in May 2013.  Siers's petition alleged the following:[1]

[¶3.]        Siers was arrested in Minnehaha County for driving under the influence of alcohol in May 2008.  Siers refused to give a blood sample to police.  He was subsequently placed in restraints and his blood was drawn without his consent and without police attempting to obtain a warrant.  The blood sample was analyzed and showed Siers to have had .22 percent by weight of alcohol in his blood.  The blood sample was the primary evidence supporting Siers's conviction for driving under the influence.  Siers pleaded guilty to the offense, and was later convicted and

---

1.        For purposes of this appeal, we presume as true all facts as alleged in the petition.

-1-

incarcerated for felony failure to appear arising from the driving under the influence conviction. Siers was represented by two attorneys from the Minnehaha County Public Defender's Office. Siers asserted in his habeas petition that the attorneys failed to fully and correctly advise Siers regarding the constitutionality of the seizure of blood evidence. Siers's petition further alleged that failure of counsel to properly advise Siers was a violation of his due process rights and that the evidence would have been suppressed and the charges against him dropped had his attorneys challenged the introduction of the blood test evidence.

[¶4.]     At the time of Siers's arrest, South Dakota case law indicated that the destruction of blood alcohol evidence by natural dissipation in the body constituted an exigent circumstance in a driving under the influence arrest, allowing for a blood draw without a warrant. However, the United States Supreme Court subsequently held in *Missouri v. McNeely* that the natural dissipation of alcohol in the bloodstream does not present a *per se* exigent circumstance justifying nonconsensual blood testing in all driving under the influence arrests. ___ U.S. at ___, 133 S. Ct. at 1563. Siers cited *McNeely* before the habeas court to support his petition.

[¶5.]     The State filed a motion to dismiss for failure to state a claim upon which relief could be granted. A hearing on the motion was held in August 2013. At the hearing, Siers argued that counsel in his driving under the influence conviction should have advised him of the constitutionality of blood evidence taken incident to arrest but without his consent, and that *McNeely* should be given retroactive effect. Siers also presented statistical evidence that retroactive

application would not be disruptive to the judicial system. The habeas court held that *McNeely* should not be applied retroactively to his habeas petition, and therefore granted the State's motion to dismiss. However, the habeas court issued a certificate of probable cause to allow Siers to appeal two *McNeely*-related issues to this Court. On appeal, this Court is asked to determine whether *McNeely* created a new rule of constitutional law and whether *McNeely* should be given retroactive application to final convictions in South Dakota.[2]

## STANDARD OF REVIEW

[¶6.] "A habeas corpus applicant has the initial burden of proof to establish a colorable claim for relief." *Steiner v. Weber*, 2011 S.D. 40, ¶ 4, 815 N.W.2d 549, 551 (quoting *Jenner v. Dooley*, 1999 S.D. 20, ¶ 11, 590 N.W.2d 463, 468). "Habeas corpus can only be used to review (1) whether the court had jurisdiction of the crime and the person of the defendant; (2) whether the sentence was authorized by law; and (3) in certain cases whether an incarcerated defendant has been deprived of basic constitutional rights." *Id.* (citation omitted). "Although we ordinarily review a habeas court's fact findings under the clearly erroneous standard, when, as here, the circuit court receives no evidence but grants the State's motion to dismiss as a

---

2. The issues addressed in this appeal are narrow. We do not address whether, under *Davis v. United States*, Siers was prejudiced by his counsel's failure to challenge the blood draw as unconstitutional or whether his counsel was otherwise ineffective. *See* ___ U.S. ___, 131 S. Ct. 2419, 2423-24, 180 L. Ed. 2d 285 (2011) (holding that evidence obtained in reasonable reliance on binding precedent is not subject to the exclusionary rule). As the court in *Davis* noted, "Retroactive application does not, however, determine what 'appropriate remedy' (if any) the defendant should obtain. Remedy is a separate, analytically distinct issue." *Id.* at ___, 131 S. Ct. at 2431 (citations omitted). In this appeal, we only address whether the habeas court should give *McNeely* retroactive effect.

matter of law, our review is de novo and we give no deference to the circuit court's legal conclusions." *Id.* (citation omitted).

## ANALYSIS AND DECISION

[¶7.]        1.        *Whether Missouri v. McNeely announced a new rule of constitutional law.*

[¶8.]        Our analysis of whether the decision in a particular case is given retroactive effect begins with a determination of whether the decision issues a "new rule" of constitutional law, or whether the case simply restates an "old rule." If the decision simply restates an old rule, the rule should be applied retroactively. *See Cowell v. Leapley*, 458 N.W.2d 514, 518 (S.D. 1990). "[B]y definition, without a new rule, there is no change in the law and the question of retroactivity is immaterial." *Larsen v. Sioux Falls Sch. Dist. No. 49-5*, 509 N.W.2d 703, 706 (S.D. 1993) (quoting *United States v. Bowen,* 500 F.2d 960, 975 (9th Cir. 1974)). In this case, Siers argues that the habeas court erred in determining that *McNeely* constituted a new rule of constitutional law. Siers asserts that *McNeely* merely restated the rule laid down in *Schmerber v. California*, 384 U.S. 757, 86 S. Ct. 1826, 16 L. Ed. 2d 908 (1966). Accordingly, Siers asks this Court to remand to the habeas court to allow Siers to argue that his trial counsel was ineffective by failing to argue that *Schmerber* prohibited the introduction of the blood evidence used in this case.

[¶9.]        In *Schmerber*, the defendant was at a hospital receiving treatment for injuries suffered in an automobile accident when police arrested the defendant for driving under the influence. *Id.* at 758, 86 S. Ct. at 1829. At the direction of a police officer, the defendant's blood was drawn without a warrant or the defendant's consent and analysis of the blood was used in the State's case against him. *Id.* at

758-59, 86 S. Ct. at 1829.  The Supreme Court upheld the warrantless blood test

because the officer "might reasonably have believed that he was confronted with an

emergency, in which the delay necessary to obtain a warrant, under the

circumstances, threatened the destruction of evidence[.]"  *Id.* at 770, 86 S. Ct. at

1835 (citations and internal quotation marks omitted).

[¶10.]       In 1977 this Court adopted a rule, based on *Schmerber*.  We stated:

> Schmerber held that bodily substance samples were not subject
> to the exclusionary rule under the Fourth Amendment if they
> are taken (1) incident to a lawful arrest, (2) by a reliable and
> accepted method of obtaining such sample, (3) in a reasonable,
> medically approved manner, and (4) where there is probable
> cause to believe that the evidence sought exists.  It also held
> that the elimination of alcohol by natural bodily functions
> presents exigent circumstances which obviate the necessity of
> obtaining a search warrant.

*State v. Hartman*, 256 N.W.2d 131, 134 (S.D. 1977) (footnotes omitted) (citing

*Schmerber*, 384 U.S. 757, 86 S. Ct. 1826, 16 L. Ed. 2d 908).  This rule was regularly

applied by this Court and guided the practice of law enforcement officers for

decades.  *See, e.g., State v. Mattson*, 2005 S.D. 71, ¶ 44, 698 N.W.2d 538, 552; *State

v. Hanson*, 1999 S.D. 9, ¶ 28, 588 N.W.2d 885, 891; *State v. Tucker*, 533 N.W.2d 152,

154 (S.D. 1995); *State v. Lanier*, 452 N.W.2d 144, 145 (S.D. 1990); *State v. Parker*,

444 N.W.2d 42, 44 (S.D. 1989).

[¶11.]       In *McNeely*, the United States Supreme Court "granted certiorari to

resolve a split of authority on the question whether the natural dissipation of

alcohol in the bloodstream establishes a *per se* exigency that suffices on its own to

justify an exception to the warrant requirement for nonconsensual blood testing in

drunk-driving investigations."  __ U.S. ___, 133 S. Ct. at 1558.  The defendant in

*McNeely* was arrested for driving under the influence and refused to provide a breath sample or blood sample. *Id.* at \_\_\_, 133 S. Ct. at 1556-57. Without attempting to obtain a warrant, the police officer took the defendant to the hospital and directed a lab technician to draw the defendant's blood. *Id.* at \_\_\_, 133 S. Ct. at 1557.

[¶12.] The defendant moved to suppress the results of the blood test, alleging a violation of his Fourth Amendment rights. *Id.* The trial court granted the suppression motion, concluding that the exigency exception to the warrant requirement did not apply because there were no circumstances suggesting an emergency other than the destruction of alcohol evidence in the defendant's body through natural metabolic processes. *Id.* The Missouri Supreme Court affirmed. The United States Supreme Court affirmed the Missouri Supreme Court in a split decision, holding that "the natural dissipation of alcohol in the bloodstream does not constitute an exigency in every case sufficient to justify conducting a blood test without a warrant." *Id.* at \_\_\_, 133 S. Ct. at 1568.

[¶13.] This Court has generally relied on the United States Supreme Court's own pronouncements to determine whether or not one of its decisions has handed down a new rule in a particular case. *See, e.g., Cowell*, 458 N.W.2d at 518 (citations omitted) ("With deference to the Supreme Court . . . we accept their determination that they are indeed 'new rules.'"); *State v. Garcia*, 2013 S.D. 46, ¶ 16, 834 N.W.2d 821, 823 (deferring to Supreme Court's decision in *Chaidez v. United States*, \_\_\_ U.S. \_\_\_, 133 S. Ct. 1103, 185 L. Ed. 2d 149 (2013), that *Padilla* announced a new rule). In this instance, however, the United States Supreme Court has not

expressly stated whether *McNeely* was a new rule or whether the decision was simply a restatement of *Schmerber* based on new facts.

[¶14.]     "A case announces a new rule . . . when it breaks new ground or imposes a new obligation on the government." *Chaidez*, ___ U.S. at ___, 133 S. Ct. at 1107 (internal quotation marks omitted) (quoting *Teague v. Lane*, 489 U.S. 288, 301, 109 S. Ct. 1060, 1070, 103 L. Ed. 2d 334 (1989)).  Conversely, a case restates an old rule "when it is merely an application of the principle that governed a prior decision to a different set of facts." *Id.* (citations and internal quotation marks omitted).  The question becomes whether "a state court considering the defendant's claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule he seeks was required by the Constitution." *O'Dell v. Netherland*, 521 U.S. 151, 156, 117 S. Ct. 1969, 1973, 138 L. Ed. 2d 351 (1997) (citations omitted).  "[A] case announces a new rule if the result was not *dictated* by precedent" such that the holding "would have been apparent to all reasonable jurists." *Chaidez*, ___ U.S. at ___, 133 S. Ct. at 1107 (citations and internal quotation marks omitted).

[¶15.]     The *McNeely* opinion explicitly states that the United States Supreme Court "granted certiorari to resolve a split of authority on the question whether the natural dissipation of alcohol in the bloodstream establishes a *per se* exigency that suffices on its own to justify an exception to the warrant requirement for nonconsensual blood testing in drunk-driving investigations." *McNeely*, ___ U.S. at ___, 133 S. Ct. at 1558.  *McNeely* acknowledged that after *Schmerber*, Iowa, Utah, and Missouri concluded that natural dissipation of alcohol in the body did not alone

constitute sufficient exigent circumstances to bypass the warrant requirement,

while Minnesota, Wisconsin, and Idaho held natural dissipation in the body was a

*per se* exigent circumstance. *Id.* at ___, 133 S. Ct. at 1558 n.2. South Dakota's

precedent aligned more closely with the latter group. The United States Supreme

Court has explained:

> While there can be no dispute that a decision announces a new
> rule if it expressly overrules a prior decision, "it is more difficult
> to determine whether we announce a new rule when a decision
> extends the reasoning of our prior cases." Because the leading
> purpose of federal habeas review is to "ensure that state courts
> conduct criminal proceedings in accordance with the
> Constitution as interpreted at the time of those proceedings," we
> have held that "the 'new rule' principle validates reasonable,
> good-faith interpretations of existing precedents made by state
> courts." This principle adheres even if those good-faith
> interpretations "are shown to be contrary to later decisions."

*Graham v. Collins*, 506 U.S. 461, 467, 113 S. Ct. 892, 897-98, 122 L. Ed. 2d 260

(1993) (citations omitted). A number of states, including South Dakota, interpreted

*Schmerber* in good faith to hold that dissipation of alcohol in the body was an

exigent circumstance obviating the need for a search warrant. These divergent

good-faith interpretations of *Schmerber* support a conclusion that the outcome in

*McNeely* was not clearly dictated by existing precedent.

[¶16.]        Furthermore, the *McNeely* decision itself highlights the reasonable

debate among jurists as to what *Schmerber* dictated. Justice Thomas's dissent in

*McNeely* interprets *Schmerber* to allow warrantless blood draws so long as there is

probable cause to believe the driver is under the influence of alcohol:

> The Court [in *Schmerber*], therefore, held that dissipation of
> alcohol in the blood constitutes an exigency that allows a blood
> draw without a warrant.

> The rapid destruction of evidence acknowledged by the parties, the majority, and *Schmerber*'s exigency determination occurs in every situation where police have probable cause to arrest a drunk driver. In turn, that destruction of evidence implicates the exigent-circumstances doctrine.
>
> . . . .
>
> Just as the suspect's efforts to destroy "highly evanescent evidence" gave rise to the exigency in *Cupp*, the natural metabolization of blood alcohol concentration (BAC) creates an exigency once police have probable cause to believe the driver is drunk. It naturally follows that police may conduct a search in these circumstances.

___ U.S. at ___, 133 S. Ct. at 1575-76 (Thomas, J., dissenting) (citations omitted). Given the split in interpretation at the state level and within the United States Supreme Court, we cannot conclude that *Schmerber* made the holding in *McNeely* "apparent to all reasonable jurists." *Chaidez*, ___ U.S. ___, 133 S. Ct. at 1107 (citation omitted).

[¶17.] Additionally, in South Dakota and many other places, *McNeely* also "breaks new ground" and "'imposes a new obligation' on the government." *See id.* (quoting *Teague*, 489 U.S. at 301, 109 S. Ct. at 1070). For decades, law enforcement agents and courts in this state have acted with the understanding that the natural dissipation of alcohol in the blood constituted exigent circumstances, such that officers did not need a warrant before ordering a drunk-driving arrestee's blood drawn. *McNeely* indicates that police can no longer rely on dissipation alone as a *per se* exigent circumstance. Because *McNeely* broke new ground in this area, and because *McNeely*'s outcome was not apparent to all reasonable jurists, we conclude that *McNeely* issued a new rule of constitutional law for retroactivity analysis purposes.

[¶18.]     2.     *Whether Missouri v. McNeely should be given retroactive application.*

[¶19.]     Because we determined that *McNeely* constituted a new rule, we next determine whether *McNeely* should be given retroactive effect in habeas corpus proceedings in South Dakota.  To determine on collateral review whether a new rule is to be given retroactive effect upon final convictions, we have generally examined three criteria: "(1) The purpose of the decision, (2) reliance on the prior rule of law, and (3) the effect upon the administration of justice."  *Garcia*, 2013 S.D. 46, ¶ 17, 834 N.W.2d at 824 (citations omitted).  These factors, adopted from *Linkletter v. Walker,* 381 U.S. 618, 85 S. Ct. 1731, 14 L. Ed. 2d 601 (1965), were first employed by this court in *State v. One 1966 Pontiac Auto.,* 270 N.W.2d 362 (S.D. 1978).

[¶20.]     The State argues that, applying the *Linkletter* factors in this case, *McNeely* should not be given retroactive effect.  Under the first prong, the State argues that *McNeely* was not "designed to improve the accuracy of criminal trials."  *Cowell*, 458 N.W.2d at 518.  Nor does the rule in *McNeely* enhance the reliability of the fact-finding process by helping "to show the actual guilt or innocence of the individual."  *Garcia*, 2013 S.D. 46, ¶ 20, 834 N.W.2d at 824.  Under the second prong, the State notes the long-standing reliance on this Court's interpretation of *Schmerber* to allow blood samples to be taken after a DUI arrest.  *See Hartman*, 256 N.W.2d at 134 ("[*Schmerber*] also held that the elimination of alcohol by natural bodily functions presents exigent circumstances which obviate the necessity of obtaining a search warrant.").  Last, the State argues that under the third prong of the *Linkletter* analysis, retroactive application of *McNeely* would have a disruptive effect on the administration of justice.  The State argues that retroactive application

may cause an influx in challenges to present and prior convictions, as well as undermine the finality of judgments in this state.

[¶21.] Siers urges this Court to refrain from applying the *Linkletter* analysis in this case. First, Siers asserts that the *Linkletter* analysis is inapplicable in this case because *McNeely* did not issue a new rule and therefore *Schmerber* should have been given its full effect in the first instance. If we apply the *Linkletter* analysis, Siers argues that retroactive application of *McNeely* would not have a disruptive effect on the administration of justice and therefore should be given retroactive effect under the third prong of *Linkletter*. As an alternative test, Siers urges this Court to adopt a retroactivity standard by which all criminal cases are given prospective and retroactive effect unless the court issuing the rule states otherwise.

[¶22.] As discussed above, we have determined *McNeely* to have issued a new rule. Accordingly, Siers's argument that *Linkletter* should not apply based on new rule/old rule grounds fails. Thus, we address whether, as a new rule, *McNeely* should nevertheless be given retroactive effect.

[¶23.] Siers does not address the first two prongs of the *Linkletter* analysis. Instead, Siers argues that the third factor of the *Linkletter* analysis weighs in favor of retroactive application in this case, because there would be little or no disruption to the administration of justice. In support of this position Siers puts forth Department of Corrections statistics, coupled with South Dakota Unified Judicial System statistics, to assert that any influx in cases caused by retroactive application in this case could be easily handled by the judicial system. Specifically, Siers notes that, as of June 2013, 398 inmates were incarcerated on DUI offenses.

He also notes that case filings across South Dakota courts increased by 1,743 from 2011 to 2012 without noted disruptions to state prosecutions. Siers concludes that if the State can handle an influx of 1,743 cases in 2012, it can easily accommodate an additional 398 cases if this Court were to retroactively apply *McNeely* and every one of those cases contained a valid *McNeely*-based challenge.

[¶24.] Our analysis under the third prong of *Linkletter* has recognized two types of disruption to the administration of justice. In some cases, we have noted a qualitative disruption to the administration of justice: the undermining of the finality of judgments in this state. *See Garcia*, 2013 S.D. 46, ¶ 26, 834 N.W.2d at 825. At other times, we have noted concern about quantitative disruption: the number of cases in which retroactive application would have an effect. *See Cowell*, 458 N.W.2d at 519; *Locke v. Erickson*, 85 S.D. 262, 265, 181 N.W.2d 100, 102 (1970) (citation omitted) ("To apply the rule retroactively would be the genesis for literally hundreds of post-conviction evidentiary hearings which in sheer numbers would virtually shatter the bounds of reality."). Siers asserts that this Court has in the past merely speculated as to the likely quantitative disruption caused by retroactive application of any given decision. Siers correctly notes that that this court has never examined statistical information to support its position that a retroactive application would be disruptive to the administration of justice.[3]

---

3. *Cowell*, when addressing the third factor, quoted concerns voiced by the United States Supreme Court about the uncertainty of the impact of retroactive applications: "We can only guess at the number of cases where *Edwards* might make a difference in the admissibility of statements . . . but the number is surely significant." 458 N.W.2d at 519 (quoting *Solem v.*

(continued . . .)

#26823

[¶25.]     Nonetheless, the judicial and correction systems statistics used by Siers fail to convince this Court that there would be no disruption to the administration of justice. As the State argues, there is probably the potential for a greater influx of legal challenges than those contemplated by Siers's statistics. Furthermore, there is the qualitative disruption to the administration of justice in that retroactive application undermines the finality of judgments. Because Siers does not directly address whether any of the other *Linkletter* factors would weigh in favor of retroactive application of *McNeely*, we do not find the balance of the *Linkletter* factors to weigh in favor of retroactive application in this case.

[¶26.]     Although Siers's use of statistical information does not convince us in this case that retroactive application is warranted under the *Linkletter* analysis, his arguments do cause us to re-examine what standard we should use to determine retroactivity. Siers urges this Court to apply the civil retroactivity standard from *Hohm* to the criminal and habeas context. Under the rule stated in *Hohm*, a decision has both retroactive and prospective effect unless the court issuing the decision states otherwise. *See Hohm v. Rapid City*, 2008 S.D. 65, ¶ 21, 753 N.W.2d 895, 906 (citation omitted). Although a pure retroactivity rule would be less complex to apply, and lead to more predictable and even-handed results, "it has the potential to create disruption in the system as more final cases are overturned." Mary C. Hutton, *Retroactivity in the States: The Impact of Teague v. Lane on State*

---

(. . . continued)
      *Stumes*, 465 U.S. 638, 650, 104 S. Ct. 1338, 1345, 79 L. Ed. 2d 579, 591
      (1984)).

*Postconviction Remedies*, 44 Ala. L. Rev. 421, 457 (1993).[4]  However, neither are we satisfied that the *Linkletter* factors are the best possible test for retroactivity.  In the interest of finality of judgment, uniformity, and ease of application, we conclude the *Teague* rule, as applied by the United States Supreme Court, to be a better rule under which to determine whether a case should be applied retroactively on collateral review.

[¶27.]    After we adopted the *Linkletter* test,[5] the United States Supreme Court rejected the *Linkletter* test in *Teague*, 489 U.S. 288, 109 S. Ct. 1060, 103 L. Ed. 2d 334 (1989).  *Teague* stated that normally a new rule would not be retroactively applied once a defendant's case had become final.  489 U.S. at 311, 109 S. Ct. at 1075-76.  Moreover, *Teague* held that retroactive application of new rules in cases that had become final would occur in only two instances: (1) when the rule announced is substantive,[6] placing "certain kinds of primary individual conduct beyond the power of the States to proscribe," or (2) when the rule is a "'watershed'

---

4.    Professor Hutton's article was cited with approval by the United States Supreme Court for its conclusion that *Teague* left states free to fashion broader retroactivity rules "which respond to the unique concerns of that state."  *See Danforth v. Minnesota*, 552 U.S. 264, 281-82, 128 S. Ct. 1029, 1042, 169 L. Ed. 2d 859 (2008).

5.    We first employed the *Linkletter* factors in *State v. One 1966 Pontiac Auto.*, 270 N.W.2d 362 (1978).  We later employed these factors in determining whether a new rule should be given retrospective effect in a collateral criminal proceeding in *McCafferty v. Solem* (*McCafferty III),* 449 N.W.2d 590, 593 (S.D. 1989), *superseded on other grounds by State v. Raymond,* 540 N.W.2d 407, 409-10 (S.D. 1995)).

6.    "In contrast, rules that regulate only the manner of determining the defendant's culpability are procedural" and not normally applied retroactively.  *Schriro v. Summerlin*, 542 U.S. 348, 353, 124 S. Ct. 2519, 2523, 159 L. Ed. 2d 442 (2004).

rule[] of criminal procedure[.]" *Danforth v. Minnesota*, 552 U.S. 264, 266, 128 S. Ct. 1029, 1032, 169 L. Ed. 2d 859 (2008).

[¶28.]   One of the driving forces behind the United States Supreme Court's adoption of *Teague* was a concern for federalism and comity. "[T]he *Teague* rule of nonretroactivity was fashioned to achieve the goals of federal habeas while minimizing federal intrusion into state criminal proceedings." *Id*. at 280, 128 S. Ct. at 1041. These concerns "are unique to federal habeas review of state convictions." *Id*. at 279, 128 S. Ct. at 1040-41. However, other concerns that drove the United States Supreme Court to adopt *Teague* are relevant to habeas determinations before this Court.

[¶29.]   First, the *Teague* rule is driven by concerns for the finality of convictions. "[T]he *Teague* principle protects not only the reasonable judgments of state courts but also the States' interest in finality quite apart from their courts." *Beard v. Banks*, 542 U.S. 406, 413, 124 S. Ct. 2504, 2511, 159 L. Ed. 2d 494 (2004). The United States Supreme Court has noted that the issue of finality "is a matter that States should be free to evaluate, and weigh the importance of, when prisoners held in state custody are seeking a remedy for a violation of federal rights by their lower courts." *Danforth*, 552 U.S. at 280, 128 S. Ct. at 1041.

[¶30.]   The interest in finality of judgments imbedded in *Teague* is an interest in which this Court has repeatedly shown great concern. As we have noted, "[o]ne of the law's very objects is the finality of its judgments. Neither innocence nor just punishment can be vindicated until the final judgment is known. Without finality, the criminal law is deprived of much of its deterrent effect." *State v. Moeller,* 511

N.W.2d 803, 808 (S.D. 1994) (internal quotation marks omitted) (quoting *McCleskey v. Zant,* 499 U.S. 467, 491, 111 S. Ct. 1454, 1468, 113 L. Ed. 2d 517, 542 (1991)); *see also, State v. Bilben*, 2014 S.D. 24, ¶ 33, 846 N.W.2d 336, 344-45 (Gilbertson, C.J., dissenting); *Garcia*, 2013 S.D. 46, ¶ 26, 834 N.W.2d at 825 ("Specifically, there exists the likelihood that applying *Padilla* retroactively would undermine the finality of any guilty plea in South Dakota made prior to and in contradiction to the United States Supreme Court's holding in *Padilla.*"); *McCafferty III*, 449 N.W.2d at 594 ("There comes a point where the justice system and society has a right to consider that a conviction fairly obtained is final."). The Legislature has reflected a similar concern for finality of judgments by limiting the scope of habeas review and the timeframe in which a prisoner may petition for relief. *See Bostick v. Weber*, 2005 S.D. 12, ¶ 14, 692 N.W.2d 517, 521 (citation omitted) ("Our state habeas remedy is not as broad as the federal habeas corpus remedy."); 2012 S.D. Sess. Laws ch. 118, § 3 (codified at SDCL 21-27-3.3) (placing two-year statute of limitations on habeas petitions).

[¶31.]     The *Teague* rule is also "grounded in concerns over uniformity and the inequity inherent in the *Linkletter* approach." *Danforth*, 552 U.S. at 280, 128 S. Ct. at 1041. Both of these concerns resonate in our application of state habeas relief. The concern with uniformity is perhaps stronger at the federal level, where the United States Supreme Court is charged with "the responsibility and authority to ensure the uniformity of federal law." *See id.* at 292, 128 S. Ct. at 1048 (Roberts, C.J., dissenting). However, some degree of uniformity and consistency should be a concern of this Court.

[¶32.] This Court has an interest in consistent results and avoiding "disparate treatment of similarly situated defendants[.]" *See id.* at 301, 128 S. Ct. at 1053, (Roberts, C.J., dissenting).[7] Siers's arguments in this case highlight the subjective and often speculative nature of applying the *Linkletter* factors. Application of the *Linkletter* factors requires some subjective weighing because there is no clear standard as to what weight should be given to each factor. As presented in this case, we have never determined whether one factor, argued alone, could be enough to secure retroactive application. Furthermore, retroactivity under the *Linkletter* factors may also depend in part on the novelty of a petitioner's case. The petitioner whose case would impact fewer other cases would have a greater chance of convincing a court that retroactive application would be warranted. The *Teague* rule removes these subjective and speculative elements from our retroactivity review.

[¶33.] Last, this Court has an interest in uniformity with the federal standard that is not being properly addressed under our current application of the *Linkletter* test. When we first rejected the *Teague* rule, we stated:

> With respect to collateral attacks on convictions, the *Teague* rule is extremely narrow. In fact, the only real issue becomes, is it a new rule? If it is, it is highly unlikely that it will be applied retroactively.

*Cowell*, 458 N.W.2d at 517. We were correct that this Court was entitled to adopt a broader rule of retroactivity than that employed in federal habeas review. However,

_____

7. We note that *Teague* was concerned with disparate treatment between those seeking relief on direct review and those seeking relief in a collateral proceeding. *See Teague*, 489 U.S. at 302, 109 S. Ct. at 1071.

our categorization that "the only real issue [under *Teague*] becomes, is it a new rule?" may have oversimplified the federal standard. Accordingly, our retroactivity analysis under the *Linkletter* factors has not addressed the exceptions in *Teague* which would require retroactive application of a new rule. *See, e.g., Garcia*, 2013 S.D. 46, 834 N.W.2d 821; *McCafferty III*, 449 N.W.2d 590.

[¶34.]    As the Nevada Supreme Court has noted, "*Teague* is not controlling on this court, other than in the minimum constitutional protections established by its two exceptions." *Colwell v. State*, 59 P.3d 463, 470 (Nev. 2002); *see also Danforth*, 552 U.S. at 288, 128 S. Ct. at 1045 ("Federal law simply 'sets certain minimum requirements that States must meet but may exceed in providing appropriate relief.'" (citation omitted)). This Court is "free to choose the degree of retroactivity or prospectivity which we believe appropriate to the particular rule under consideration, so long as we give federal constitutional rights at least as broad a scope as the United States Supreme Court requires." *Danforth*, 552 U.S. at 276, 128 S. Ct. at 1039 (quoting *State v. Fair,* 502 P.2d 1150, 1152 (Or. 1972)).

[¶35.]    Instead of looking to *Teague* as a minimum standard for retroactivity and applying a broader complimentary state rule, this Court's retroactivity analysis has largely ignored *Teague* altogether. Some degree of nonuniformity has been recognized as "a necessary consequence of a federalist system of government." *Id.* at 290, 128 S. Ct. at 1047. However, without addressing the *Teague* exceptions, a South Dakota court may find that a case does not require retroactive application— based on the rule's purpose, reliance on the old rule, and effect on the administration of justice. The same request for retroactive relief, but under federal

habeas review, may succeed by arguing that the rule fits one of the *Teague* exceptions and thus must be given retroactive effect. This conflict and non-uniformity is undesirable.

[¶36.] Although we declared in *Cowell* that the *Teague* rule was "unduly narrow," 458 N.W.2d at 518, our case law reflects that we have not utilized the *Linkletter* standard to grant any greater retroactivity than under the federal standard. By applying the *Teague* test for retroactivity, this Court can better address concerns for finality, consistency, and uniformity—all by way of a simpler, more straightforward test. Moving forward, we therefore adopt the *Teague* rule. A new rule is applied to convictions that have become final only when (1) the rule announced is substantive,[8] placing "certain kinds of primary individual conduct beyond the power of the States to proscribe," or (2) the rule is a "'watershed' rule[] of criminal procedure[.]" *Danforth*, 552 U.S. at 266, 128 S. Ct. at 1032. The new rule announced in *McNeely* did not place any form of individual conduct beyond the power of the State to proscribe. Nor was it a new watershed rule of criminal procedure. Thus, we answer the retroactivity question the same under the new standard as we would have under the old and determine that *McNeely* should not be given retroactive effect.

---

8. "In contrast, rules that regulate only the manner of determining the defendant's culpability are procedural" and not normally applied retroactively. *Summerlin*, 542 U.S. at 353, 124 S. Ct. at 2523.

## CONCLUSION

[¶37.]     For the above stated reasons, we conclude that *Missouri v. McNeely*, __ U.S. __, 133 S. Ct. 1552, 185 L. Ed. 2d 696 (2013), declared a new rule of constitutional law.  The new rule announced in *McNeely* was not a rule which warrants retroactive application to cases on habeas review.  Accordingly, we affirm the habeas court's grant of the State's motion to dismiss.

[¶38.]     KONENKAMP, ZINTER, SEVERSON, and WILBUR, Justices, concur.