[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-11857
_____

D.C. Docket No. 5:11-cv-00081-RS


PAUL GLEN EVERETT,

Petitioner-Appellant,

versus

SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Florida
_____

(February 27, 2015)

Before HULL, WILLIAM PRYOR and JULIE CARNES, Circuit Judges.

HULL, Circuit Judge:

Paul Everett, a Florida inmate, filed a 28 U.S.C. § 2254 petition for a writ of

habeas corpus, raising multiple challenges to his first-degree murder conviction

and death sentence.  The district court denied Everett's petition, but granted him a certificate of appealability ("COA") as to one issue: Whether a law enforcement officer's request for a consent to search from, or service of an arrest warrant on, a defendant in custody who has invoked the right to counsel violates the Fifth Amendment.

Upon Everett's motion, this Court expanded the COA to include an additional issue: Whether the district court erred in denying Everett's claim that his trial counsel rendered ineffective assistance in the investigation and presentation of mitigating evidence during the penalty phase of his 2002 trial.

Having considered the state court record, the district court's thorough order, and the parties' submissions, and with the benefit of oral argument, we affirm the district court's denial of Everett's § 2254 petition.

## I.  CRIME, GUILT PHASE, AND VERDICTS

### A.    Murder, Burglary, and Sexual Battery

On Friday, November 2, 2001, during the late afternoon or early evening, Everett was roaming the neighborhood where victim Kelli M. Bailey lived in Panama City Beach, Florida.  Everett was armed with a wooden fish bat and "looking for . . . some money."  He entered the home of Bailey, a stranger to him, uninvited, possibly through an unlocked door.

2

Bailey emerged from her bedroom and confronted Everett in the living room.  Everett beat Bailey, and as she tried to run back to her bedroom, he knocked her down and raped her.  Everett also twisted Bailey's neck, breaking a vertebra, which paralyzed her and caused her to suffocate to death.[1]  Bailey suffered extensive other injuries, including multiple abrasions on her face; swollen eyelids and hemorrhaging of the eyes; a fractured nose; lacerations and bruising on her lips; a tear in her lip through which her teeth protruded; a knocked-out tooth; bruising of her tongue where her teeth impacted the tongue; and abrasions on her body consistent with carpet burn.

Before leaving Bailey's house, Everett removed his shirt, but he took with him some cash and a credit card from Bailey's purse, his fish bat, and her jacket.  Outside the house, Everett discarded all but the cash.  Everett returned to the Fiesta Motel, the nearby motel where he was staying at the time.

Bailey did not show up that evening for her seven o'clock shift as a medical technologist at a hospital and thus a concerned coworker called her home phone and left multiple messages on her answering machine.  The coworker then called Bailey's stepfather, John Greathouse, who lived less than a mile from Bailey, to ask Greathouse if he knew where Bailey was.  Greathouse drove to Bailey's house

---

[1]The medical examiner testified that it may have taken Bailey up to several minutes to lose consciousness after she was paralyzed.

3

and entered through her back door using his key.  Greathouse discovered Bailey lying dead in the doorway to her bedroom, and he called 911.

Police responded and investigated the murder scene, where they found blood spatter in the living room, on the doorway to Bailey's bedroom, and in her bedroom.  Police found Bailey lying face down in the entrance to her bedroom, with her legs partially splayed.  One of Bailey's teeth was lying on the floor next to her head.  Bailey's jacket and credit card were discovered one block from her house.

Additionally, police recovered a fish bat approximately 133 feet from Bailey's back door.  The bat tested positive for the presumptive presence of blood. The police subsequently discovered that an individual—later determined to be Everett—had purchased the same model of fish bat at a local Wal-Mart store on October 27, 2001.

## B.    Everett's Arrest in Florida

At the time of the murder, Everett was a fugitive from justice in Alabama, where he previously had received a ten-year suspended sentence for a 1999 conviction of possession of a forged instrument.  In February 2000, Everett's probation was revoked, and he was sentenced to ten years in state prison.  Everett posted a supersedeas bond pending his direct appeal.  When his appeal was denied on October 5, 2001, Everett was required to begin serving his sentence within

4

fifteen days under the terms of the bond.  Instead of turning himself in by his October 20, 2001 deadline, Everett fled to Florida.

Accordingly, an Alabama bail bondsman was searching for Everett at the time of the November 2001 murder.  Around nine o'clock on the night of the murder, based on a tip from one of Everett's sisters, the bail bondsman found Everett at the Fiesta Motel.  The bail bondsman took Everett into custody and transported him to Alabama authorities.  Everett was then jailed at the Baldwin County Corrections Facility in Alabama.

## C.    Everett's First Statement, November 14, 2001, in Baldwin County, Alabama Jail

On November 14, 2001, Sergeant Rodney Tilley and Lieutenant Chad Lindsey, investigators with the Panama City Beach Police Department, traveled to the Baldwin County jail to interview Everett regarding the Bailey homicide.  The police in Florida had traced the fish bat found near the crime scene to Everett, and had learned that Everett was being held in the Baldwin County jail in Alabama.

At the beginning of the twelve-minute interview—which was tape-recorded and subsequently transcribed—Sergeant Tilley said to Everett, "[Y]ou understand the right to remain silent, you do not have to talk to me, you have the right to have an attorney present before we talk."  Everett confirmed that he understood and that he wished to speak with the officers.

5

In his transcribed November 14 statement, Everett indicated that, when the bail bondsman found him at the Fiesta Motel, he had been in Panama City[2] for a couple of weeks.  Everett had come down to Panama City from Alabama to meet up with a friend, Jared Farmer, with whom he spent most of his visit using crystal methamphetamine and marijuana.  Everett financed the trip and the drugs in part by writing bad checks, including at a Wal-Mart store, where he purchased a fish bat among other items.  Everett said that he had not seen the fish bat since leaving it in Farmer's pick-up truck about a week before leaving Panama City.

When Sergeant Tilley asked Everett what shoes he had with him during the trip, Everett stated that he had worn a pair of sneakers that he subsequently threw away when the sneakers got blood on them during a fight with another man on the beach.  After Sergeant Tilley noted that Everett's story about throwing away the shoes did not "jive," Everett stated, "I wish to have a lawyer present.  I can tell you, I can see where this is going.  I mean I want a lawyer."

The transcript of the November 14 statement reflects that Sergeant Tilley then noted that Everett had requested a lawyer, after which one of the officers shut off the tape recorder.

---

[2]Although Panama City and Panama City Beach are separate municipalities, Everett and the Panama City Beach Police Department officers referred to the area generally as Panama City. We adopt this convention.

According to Sergeant Tilley's and Lieutenant Lindsey's subsequent depositions, as the Florida officers were "packing up" and leaving the room, Lieutenant Lindsey said something to Everett to the effect of, "Don't be lying, don't be caught in a lie, you know, now's the chance for you to tell the truth, you know, because I don't want to see the State of Florida stick a needle in your arm." Picking up on Lieutenant Lindsey's attempt to play "bad cop," Sergeant Tilley took on the role of "good cop" and said to Everett, "[M]an, you know, I think this might have been a burglary that went bad. . . . I would sure like to hear it from you, but . . . ."

At that point, from Sergeant Tilley's perspective, Everett "mellowed in his seat." Sergeant Tilley then stated, "[W]ell, if you want to talk to me, just let me know, let these folks know." Sergeant Tilley believed that this left things between him and Everett on good terms.

## D.    Request for Consent for DNA Samples—November 19, 2001

Following Everett's November 14 statement, and sometime on or before November 19, Sergeant Tilley contacted Officer John Murphy, a detective in the Sheriff's Office in Baldwin County, Alabama. Sergeant Tilley asked Murphy to obtain consent from Everett to collect blood and saliva samples for Tilley's investigation of the Bailey homicide. Thus, on November 19, Officer Murphy in Baldwin County asked for Everett's consent to collect the DNA samples.

7

On November 21, 2001, Officer Murphy prepared a written report concerning his November 19 interaction with Everett. According to that report, Everett agreed verbally and in writing to Officer Murphy's request for DNA samples. The signed consent forms state in full:

> The undersigned, Everett, Paul, does hereby voluntarily and consentually [sic], grant permission for, Mary Hadley [illegible], to draw or extract a sample of my blood or hair. This consent is hereby granted without any pressure, force, or promises made to me. The sample or samples may be given to, John Murphy, with the, Baldwin County Sheriffs Office.
>
> . . .
>
> I, Paul Everett, having been informed of my constitutional right not to have a search made of the body hereinafter described without a search warrant and of my right to refuse to consent to said search, do hereby authorize John D. Murphy, who are officers of the Baldwin County Sheriff's Department, to conduct a complete search of my: Body – Blood, Hair, Saliva. . . . I further state that I am the proper person to authorize the search referred to herein. This permission is being given voluntarily and without threats or promises of any kind.

(Paragraph breaks omitted).

Everett provided the samples to Officer Murphy in Alabama. No Florida police were there then, although Florida police arrived later.

**E.    November 19 Statement to Officer Murphy and Sergeant Tilley**

Officer Murphy's written report further reflects that, after providing the DNA samples, Everett told Officer Murphy that Everett had been attempting unsuccessfully "to contact his [a]ttorney" regarding the Bailey homicide

8

investigation.  Everett said that he wished to "write a name on a piece of paper" for Officer Murphy to deliver to Sergeant Tilley, so as to "[p]oint [Sergeant Tilley] in the right direction."  Officer Murphy stated that he would deliver the piece of paper only after advising Everett of his rights under Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966).  Officer Murphy in Alabama then read Everett his Miranda rights, and Everett signed a copy of his rights and a waiver of them.

On the signed "Statement of Miranda Rights," Everett put a checkmark next to each of the five enumerated rights, including "the right to remain silent" and "the right to talk to a lawyer and have him present with you while you are being questioned."  Everett also signed below a "Waiver of Rights," which stated, "I have read the above statement of my rights, and I understand each of them. Having these rights in mind, I waive them and willingly make a statement."

Officer Murphy's written report states that Everett then told Officer Murphy that he would like to provide additional information "[o]ff the [r]ecord."  Officer Murphy informed Everett that any information Everett provided would have to be on the record and recorded.  Everett replied that he would provide a statement to either Officer Murphy or Sergeant Tilley.  Because Sergeant Tilley was en route from Panama City to collect the DNA samples, Officer Murphy started the interview with the understanding that Sergeant Tilley would join the interview when he arrived.

9

Sergeant Tilley arrived from Florida just as Everett was starting his statement to Officer Murphy, which Officer Murphy tape-recorded.  According to the transcription of Everett's statement, Officer Murphy again advised Everett of his <u>Miranda</u> rights, stating, "You have the right to remain silent, anything you say can and will be used against you in a court of law.  You have the right to talk to a lawyer and have him present with you while you are being questioned if you wish. [If y]ou cannot afford to hire a lawyer[,] one will be appointed to represent you before any questioning.  If you decide at anytime [sic] to exercise these rights and not answer any questions or make any statements."  Everett confirmed that he understood his rights and was willing to speak with Officer Murphy.

In his November 19 statement, Everett claimed that, while in Panama City, he and an acquaintance, "Bubba," visited the home of Bubba's lady friend, "Angel," a couple days after Halloween.[3]  Bubba left to buy drugs, during which time Angel and Everett struck up a conversation and had unprotected sex.  Afterwards, as Everett and Angel sat talking, still partially undressed, Bubba returned and became enraged upon finding them together only partially dressed.

Bubba started cursing and beating "Angel," and after Everett voiced objection, Bubba pulled out a gun.  Bubba pointed the gun at Everett, telling

---

[3]Police interviewed "Bubba," a man named Fred Wilson, but never identified any connection between him and victim Bailey.  The name "Angel" was given by Everett for the person Everett claims was in the house with Bubba.

10

Everett it was none of his business and that he should leave. Everett left the house, at which point Angel was still alive and conscious. Everett had the fish bat with him, and he dropped it as he fled. Once back at the Fiesta Motel, Everett discovered that he had blood on his shorts and shoes from when Bubba punched Angel, and he threw these items away.

Everett also stated that, although he was "not the type of person to tell on anybody," since he had learned "what happened" to Angel after he left her house, he had been unable to sleep and it was "getting to [him]." Everett indicated that he had been planning on contacting Sergeant Tilley, noting, "I've got Sergeant Tilley's card and I was going to be placing a call today (inaudible) said he was already coming. (Inaudible) my mother talked about this Friday and uh, I wanted to go ahead and get it off my chest lawyer or not. I know (inaudible) what happened (inaudible)."

At the end of his November 19 statement, Everett said to Sergeant Tilley, "I do want to talk to a lawyer, but I did want to let you know to get you in the right direction to where . . . ." Sergeant Tilley interrupted, asking whether Everett wanted an attorney at this point. Everett responded that he did but that he wanted to set Sergeant Tilley in the "right direction." Sergeant Tilley indicated that he would not speak to Everett without an attorney present, and then reminded Everett

11

to contact him if Everett wished to speak again.  Everett noted that he was "racking [his] brains," "trying to think of every detail."

## F.    Service of Arrest Warrant and November 27, 2001, Statement

Subsequently, Sergeant Tilley in Florida called Officer Murphy in Alabama to say that he would be coming to serve an arrest warrant on Everett for Bailey's murder.  Sergeant Tilley asked Officer Murphy to set up an interview room for the service of the warrant.

According to Sergeant Tilley's deposition, on November 27, 2001, when Tilley arrived, Officer Murphy was in the interview room with Everett, who had asked to speak to Tilley again.  Tilley presented the arrest warrant to Everett and then said, "I understand you want to talk to me."  Everett responded in the affirmative and then started to talk before Sergeant Tilley even had a chance to start the tape recorder.  Sergeant Tilley interrupted Everett to start the tape recorder.

At the beginning of his recorded November 27 statement, Everett acknowledged that he previously had requested an attorney, but that when presented with the arrest warrant that day, he had asked to speak to Sergeant Tilley without the presence of a lawyer.  Sergeant Tilley then stated, "Ok, do you understand that you can still stop at anytime [sic]; you still have your rights?"—to

12

which Everett responded, "Yes, sir."  In his deposition, Sergeant Tilley indicated that this statement was intended to remind Everett of his Miranda rights.

Everett then confessed to beating and raping Bailey.  Although Everett repeatedly denied knowing that Bailey was killed, he admitted to the jerking and twisting of Bailey's neck that resulted in her death according to the medical examiner's trial testimony.  Everett indicated that, on the evening of the murder, he was walking around Bailey's neighborhood with Bubba.  Everett had smoked crack the day before and had used acid earlier that day, and he was "tripping" and "looking for . . . some money."  Everett saw Bailey's house and assumed that no one was home, as the lights were all out and it was too early for anyone to be in bed.[4]  While Bubba waited outside as a "look out," Everett walked up and knocked on the door.  After no one answered, he opened the unlocked door and entered the house.

Everett described the layout of Bailey's living room and stated that the first thing he noticed when he entered her house was her purse on a table in the living room.  Everett went to the purse and removed around seventy dollars in cash and possibly a credit card.  Bailey then entered the living room from the bedroom and "started running towards [Everett]."  Everett and Bailey got "in a tussle," but

---

[4]The other record evidence does not support Everett's claim that he thought no one was home, as testimony indicated that the lights in Bailey's house were on and her car was in the driveway.

Everett claimed that he did not remember much after that because he "was tripping on acid" and "the LSD pretty much started getting to [him] like really heavy" at that point.

Everett, however, admitted that he punched Bailey two or three times with his fist, caused her to bleed, grabbed her by the hair as she attempted to run to the bedroom, jerked her head back, "possib[ly]" twisted her head, knocked her down, and raped her, vaginally and anally. Everett claimed that he brought the fish bat with him to Bailey's house but never hit her with it.

Everett removed his shirt and left it at Bailey's house. He grabbed "something" from her house to wear but discarded it after leaving the house and running straight toward the Fiesta Motel. He also discarded his shoes in a trashcan at the motel. Everett claimed that he "had no idea that [Bailey] had been killed until the day [Sergeant Tilley and Lieutenant Lindsey] came the first time," and since that first interview, "it ha[d] been going through [his] mind."

Everett's November 27 statement was the only one offered at trial.

## G.    Indictment, Appointment of Counsel, and Not Guilty Plea

On January 28, 2002, a Florida grand jury indicted Everett on charges of first-degree murder, burglary of a dwelling with a battery, and sexual battery involving serious physical force. Public Defender Walter B. Smith was appointed to represent Everett. Everett entered a plea of not guilty.

14

**H.    Motion to Suppress**

Prior to trial, defense counsel Smith moved to suppress the statements that Everett made on November 19 and 27, 2001 as violative of Everett's rights under the Fifth Amendment because the officers did not honor Everett's November 14 request for a lawyer.

The trial court held a hearing on the motion to suppress.  At the hearing, the parties agreed to stipulate to the facts surrounding Everett's statements as presented in (1) the November 21, 2001, report by Officer Murphy recounting the details of his November 19 interaction with Everett; (2) the deposition transcripts of Sergeant Tilley and Lieutenant Lindsey; and (3) the transcripts of the interviews of Everett on November 14, 19, and 27, 2001.  The parties then offered arguments on their respective positions on the suppression issue.  Everett did not testify at the suppression hearing.

In an order, the state trial court denied the motion to suppress on grounds that (1) as to the request for DNA samples, the Fifth Amendment privilege against self-incrimination did not extend to the taking of the DNA samples; (2) as to the November 19 interview, Everett himself initiated the interview after consenting to the provision of the DNA samples; and (3) as to the November 27 interview, Everett again initiated the interview after being served with the arrest warrant.

15

The state trial court specifically found that the officers had not subjected Everett to any interrogation prior to seeking his consent for the DNA samples on November 19, and that his consent was not involuntarily given or the result of any coercion or wrongdoing on the part of law enforcement.  The trial court also found that, on November 27, Everett "was not being brought in for the purpose of any additional questioning" and "it was [Everett], and not the officers, who initiated the request for the interview . . . after being served with the arrest warrant."  In sum, "there [was] nothing to establish that the officers coerced, forced or misled [Everett] into giving either the November 19[] or November 27, 2001 interviews."

At trial, over the defense's objection, the state trial court admitted the DNA samples and the tape recording and transcript of Everett's November 27 confession during the State's case-in-chief.

## I.    Guilt Phase in November 2002

During the guilt phase of Everett's 2002 trial, the State presented overwhelming evidence of Everett's guilt.  For example, a DNA expert testified that the DNA from vaginal swabs of victim Bailey matched Everett's DNA on all thirteen genetic markers tested.  The DNA expert further testified that the "frequency occurrence" of someone having Everett's DNA profile was one in 15.1

quadrillion of the Caucasian population, 1.01 quintillion of the African-American population, and 11.2 quadrillion of the Hispanic population.[5]

Further, the medical examiner testified that there was an abrasion at the base of Bailey's vagina that was fresh at the time of her death, and that the abrasion was consistent with forceful impact in that area by either nonconsensual sexual penetration or a blunt object. The medical examiner also testified as to the brutal and deadly attack on Bailey, as evidenced by her broken neck, fractured nose, swollen eyelids, hemorrhaging of the eyes, and multiple abrasions, lacerations, and bruises. The damage to Bailey's neck, according to the medical examiner, was consistent with a "twisting motion, rather than a single blow to that area."

The jury also heard evidence linking the fish bat, which police recovered approximately 133 feet from Bailey's back door, to the murder scene and to Everett. Besides the bat's proximity to Bailey's home, the bat tested positive for the presumptive presence of blood, and a crime scene analyst testified about the extensive blood spatter found around and near Bailey's body. In addition, the medical examiner testified that Bailey's injuries, including her missing and disrupted teeth, were consistent with a blow to the face by a firm, blunt object.

---

[5]In addition to Everett, the police obtained DNA samples from four other men, Fred "Bubba" Wilson, Jared Farmer, William Miner, and Steve Colson. The DNA expert testified that Wilson, Farmer, Miner, and Colson "were all excluded as potential DNA contributors to the male fraction . . . found on the vaginal swabs."

As to the link between the fish bat and Everett, the State presented evidence that the same model of fish bat was purchased at a Panama City Beach Wal-Mart on October 27, 2001, less than a week before the murder. A surveillance camera videotape of that transaction was played for the jury, and a testifying investigator identified Everett as the person on the video purchasing the fish bat.

Finally, the tape recording of Everett's November 27 statement was admitted into evidence and played for the jury. In that statement, as recounted above, Everett admitted to entering Bailey's house with the fish bat, getting "in a tussle" with Bailey, punching her two or three times, causing her to bleed, grabbing her by the hair and jerking her head back as she attempted to escape, knocking her down, and raping her, vaginally and anally. While, as noted above, Everett did not admit to killing Bailey, he admitted the beating conduct and acts that resulted in her death.

The jury found Everett guilty as charged.

## II.  PENALTY PHASE EVIDENCE

Following the penalty phase, the jury recommended a death sentence for Everett by a unanimous vote. Because Everett argues that his trial counsel, Smith, rendered ineffective assistance regarding mitigating evidence, we outline the steps that Smith took to investigate, develop, and present mitigating evidence.

### A.    Pre-Trial Investigation of Mitigating Factors

Upon his appointment, Smith immediately recognized that Everett's case involved the possibility of the death penalty. Accordingly, from the beginning of his appointment in March 2002, Smith prepared for both the guilt and penalty phases of trial.

1.    Meetings with Everett

Smith and his investigator, Earnest Jordan, met with Everett in jail several times leading up to the trial, including at least once a month between March and June of 2002. Smith and Everett also corresponded "quite often."

In March 2002, investigator Jordan met with Everett and obtained basic biographical information and the names and contact information of Everett's immediate family members. Everett advised Jordan that he had a drug problem and had been using drugs since around the age of thirteen, beginning with "weed and beer." At age fifteen, Everett started experimenting with acid and methamphetamine. At sixteen, he learned how to cook and manufacture methamphetamine.

In April 2002, attorney Smith met with Everett in an attempt to obtain more background information. Smith learned that, although Everett made it only to the tenth grade, Everett never was in "any special ed classes or emotionally handicapped classes." Everett had an "unremarkable" childhood and had split his time growing up between Fort Payne, Alabama and Sylvania, Georgia. Everett

19

attended church "for awhile" in the past, and he provided Smith a name of a church leader who possibly could serve as a character witness. However, Everett "could not come up with any other names of teachers or community leaders who might be helpful."

Everett reiterated his history of drug use since his early teen years, and also stated that he used amphetamines every day while in Panama City during the two-week period in October and November 2002 leading up to the murder. Everett claimed that an acquaintance from Fort Payne, Joe Garrett, was around him when he was on drugs and might be able to testify at to Everett's behavioral changes when using drugs heavily.

During Smith's April 2002 meeting, Everett claimed that Farmer and Bubba were present at Bailey's house when she was killed. Everett stated that Bubba was acquainted with Bailey and that he, Bubba, and Farmer went to her house to steal money for drugs. The three men entered through the back door, and Everett was rifling through Bailey's purse when she emerged from her bedroom. During his meeting with Smith, Everett admitted to striking and raping Bailey but claimed that she was alive when he left the house with Bubba and Farmer still inside. Everett suggested that Bubba and Farmer must have killed Bailey after he left, and he claimed that Farmer was a suspect in another rape–homicide in Fort Payne.

In May 2002, defense counsel Smith spoke over the phone with one of Everett's sisters, Vicki Godby, who stated that she was not sure whether it would help or hurt Everett if she testified at his penalty hearing. Godby said that she had some anger about the way that Everett had acted in the past and that, if he indeed were guilty of the charges, the death penalty might be appropriate for him.

That same month, investigator Jordan met with Everett. During the meeting, Everett told another version of the events leading up to Bailey's death, claiming that Bailey came by mistake to the hotel room where he and Farmer were making drugs, which caused him to believe that Bailey was a federal agent. Everett also claimed that he later saw Bailey again while he was out jogging in her neighborhood. Everett then cut off his meeting with Jordan, stating that Jordan would have to return later to finish the conversation.

In June 2002, investigator Jordan and Everett met again. During the meeting, Jordan encouraged Everett to think of anyone else who might be helpful to the case, and Everett provided the names of a few people who might have information concerning Farmer. Subsequently, Everett's story about how Bailey was killed further evolved, and by trial time, Everett was telling Smith that Bailey was a double agent who was herself involved in drugs.

2.    Development of Mitigation Evidence

21

Defense counsel Smith's initial mitigation strategy was to rely on Everett's father, Sidney Everett ("Sidney"), to secure mitigation witnesses, as Sidney had a lot of contacts in northern Alabama where Everett had been living at the time of his crimes and where he grew up in part. Sidney pledged to "twist arms" or do "whatever he had to . . . to get witnesses . . . to testify and say good things about Mr. Everett." Moreover, Smith found that Sidney "had a realistic appraisal of what was going on" with the case, while Everett's mother was in denial of her son's guilt and lived in a different state than her son. Unfortunately, however, Sidney passed away before trial.

After Sidney's death, Smith and Jordan traveled to Alabama in October 2002 in an attempt to find mitigation witnesses. One of Everett's sisters was supposed to take off work that day to help Smith and Jordan track down potential witnesses. However, Everett's sister instead went to work that day, leaving them to "run[] around on [their] own" to find potential witnesses until she got off work. Despite this, Smith and Jordan were able to interview Everett's high school principal and his guidance counselor; Everett's friend Joe Garrett; Everett's sister Cindy Grider and her husband; and family friend Joe Scott.

The guidance counselor did not remember Everett. The principal, Mr. Tally, remembered Everett but "characterized him as a truant who did not like to attend school." Nevertheless, Mr. Tally did not consider Everett to have been a discipline

22

problem.  Smith and Jordan also obtained Everett's school records, including his report cards.  Everett's report cards showed a range of grades, from A's to F's, and the records indicated a history of absenteeism, particularly in high school.

Smith and Jordan also found and interviewed Joe Garrett, the friend who Everett said could testify about Everett's behavior while on drugs.  Garrett stated that he and Everett were very close growing up and he never knew Everett to be a violent individual.  Garrett claimed that Everett had had "quite a few girlfriends," none of whom Garrett thought would be good mitigation witnesses because Everett "tended to use his girlfriends and throw them away."  Specifically, Everett would borrow money or cars from his girlfriends and "not return items to these girls."

Cindy Grider, Everett's sister, told Smith and Jordan that she would try to come up with the names of additional people with whom they could meet.

Joe Scott had been a friend of Sidney's.  However, "Scott did not have any kind words to say about Paul Everett . . . [and] also seemed to be rather critical of [Sidney]."  Scott did not express any interest in serving as a mitigation witness for Everett.

Overall, Smith and Jordan kept running into "dead ends" in their mitigation investigation and could not find "much redeeming about [Everett]," who "wasn't a Boy Scout, . . . wasn't an athlete, . . . wasn't a scholar, . . . didn't go to church," and "never had a job."  Some of Everett's own sisters wanted nothing to do with

him.  The sisters who would speak in support of him could say only that they loved their brother, were close to him, and never saw him do anything violent.  After the trip to Alabama, Smith and Jordan did not feel that there would be any more mitigation evidence forthcoming.

As to Everett's changing stories concerning Bailey's murder and his attempts to implicate Farmer and Bubba, defense counsel Smith attempted to verify Everett's claims but hit another dead end.  Specifically, Smith located and interviewed Jared Farmer, who claimed that he and Everett were not together on the day of the murder.  Smith also verified that Bubba was a real person.  Smith, however, learned that Bubba was in a cast at the time of the murder because he had been in an accident where he was trampled by a horse.  Ultimately, because Everett (between his arrest and his trial) had come up with so many versions of his story of how Bailey died, Smith did not know what Everett would testify to if called to the stand.  Smith knew that Everett "would have been crucified on cross examination."

Finally, as to Everett's claim that he was "tripping on acid" at the time of the crime, Smith could find no evidence to corroborate this claim.  Smith asked Farmer about Everett's alleged drug use, but Farmer "denied any knowledge of drug use" and said that he had no idea what Everett was doing the day of the murder.  Additionally, Everett's story—that he committed the crime only because he was "tripping on acid"—did not fit with the evidence that he left his motel room that

24

evening armed with a fish bat and looking specifically for money. Indeed, Smith read a statement from the bail bondsman which stated that the bail bondsman had detained Everett "without any kind of incident" shortly after the murder. Smith viewed this as inconsistent with Everett's story that he was in a violent, drug-induced state the evening of the murder. Therefore, although Smith had no doubt that Everett was "messing around with drugs" while in Panama City, it appeared to amount simply to "recreational drug use."

3.      Mental Health Expert

Defense counsel Smith could tell from his interactions with Everett that Everett was not "mentally retarded . . . [and] didn't appear[] to be mentally ill," and Everett did not have any history of mental illness, psychological problems, or "drug abuse problems."[6] Nevertheless, as a "CYA" measure, Smith had Dr. Jill Rowan conduct a psychological evaluation of Everett to ensure that he was mentally competent, could testify if he had to, and had a realistic understanding of how the legal system works.

On July 23, 2002, at Smith's request, Dr. Rowan conducted a forty-five-minute evaluation of Everett, who was twenty-three years old at that time. In her

---

[6]Although defense counsel Smith testified at the state post-conviction evidentiary hearing that he did not recall Everett having any "drug abuse problems," he also stated that he did not recall many of the specifics of his mitigation investigation and that he "would defer to whatever is in [his] files." Smith's notes documenting his meetings with Everett clearly indicate that he was aware of Everett's history of drug use.

25

report, Dr. Rowan indicated that Everett advised that he had seven older sisters and had split his time growing up with his mother and father depending on his mood. Everett dropped out of school in the tenth grade, after which he obtained his GED. He had a history of drug use, beginning at age fifteen, including LSD, methamphetamine, marijuana, and pills.

Dr. Rowan further reported that Everett was cooperative, had good attention span and concentration, and had clear and coherent thinking, and that she found it "easy to follow his presentation." Everett exhibited a grandiosity and over-confidence that were likely a combination of immaturity, denial, and personality. Everett referred to Smith by Smith's first name, thought "he ought to be in charge of his case," and indicated that he planned to attend law school if found not guilty. Given the severity of the case, Dr. Rowan concluded that Everett had not fully arrived at a realistic understanding of his situation.

Everett told Dr. Rowan that he spent his time in jail reading novels, law books, and the paperwork in his case. Everett was able to speak conversantly about, and demonstrated an understanding of, the charges against him, the possible penalties, his actions on the day of the murder, the legal process generally, and the specifics of his case. Dr. Rowan concluded that "[t]here was nothing in his presentation that indicated a full Competence evaluation ought to be done." And

26

"Everett demonstrated no signs of mental retardation or of a major illness. His grandiosity [was] not of psychotic proportions."

Counsel Smith concluded that Dr. Rowan's assessment of Everett corroborated his belief that that there was no reason to question Everett's mental competency, and so he did not request "any greater psychological work up," which he believed "would probably be detrimental to [Everett]." Specifically, Everett struck Smith as having "pretty classic" "antisocial personality disorder," and Smith feared having any personality tests administered. Everett just seemed very "carefree" about the case, with unrealistic expectations about how he would not be convicted and would go on to attend law school.

## B.    The State's Penalty Phase Evidence

The State opened the penalty-phase hearing with a victim impact statement by Greathouse, Bailey's stepfather who raised her since the age of three. In his statement, Greathouse described Bailey's intelligence, hard-working nature, and love of her family, and the impact of Bailey's death on him, Bailey's mother, and the rest of their family.[7]

---

[7]The state trial court instructed the jury to rely, in the jury's sentencing recommendation, only on the evidence of the aggravating and mitigating circumstances, and not to consider Greathouse's victim impact statement in its sentencing recommendation. Rather, the victim impact statement was intended only to help the jury "determine the victim's uniqueness as an individual human being and the result and loss to the community members by the victim's death."

The State presented evidence that Everett was under a sentence of imprisonment for the Alabama conviction of possession of a forged instrument when he killed Bailey, which could serve as an aggravating circumstance for purposes of the death penalty.  The State also relied on the guilt-phase evidence to argue that it had shown two other aggravating circumstances, namely that Everett committed the murder during the course of a sexual battery and that the murder was particularly heinous, atrocious, or cruel.

## C.    Presentation of Mitigation Evidence Before the Jury

During the penalty phase of Everett's trial, Smith presented two witnesses: Everett's mother, Glenda Everett ("Glenda"), and one of Everett's sisters, Cindy Grider, who both testified generally as to Everett's loving and non-violent nature.

### 1.    Glenda Everett

Glenda testified that Everett was born to her and Sidney in Fort Payne, Alabama in 1979.  Everett had seven older sisters, all of whom loved him and spent a lot of time with him growing up.  As a child, Everett was fun-loving, loved to play with others, loved to be with his friends and family, and loved people in general.  At some point, Glenda and Sidney started having problems and divorced, after which Glenda moved her kids, including Everett, to the part of Georgia where she was from.

28

Glenda and Sidney subsequently decided to try to work things out for the sake of the family and remarried, and Glenda returned to Alabama with the kids. The marriage, however, fell apart again, and Glenda and her children moved back to Georgia. Everett missed his father so much that at some point Glenda allowed him to move back to Alabama to live with his father. Glenda also testified that "[i]t was never easy on Paul coming from a broken home" and that he had a hard time accepting that he came from a broken home. Everett loved his father, but his father had "problems," "was an alcoholic," and "at times would say things to [Everett] that no child needed to know."

Glenda believed that her son turned to drugs to block out some of the bad memories of his father. She first noticed that Everett had a drug problem when he was around eighteen or nineteen years old, and she encouraged him for years to get into treatment for his drug problem. In the months leading up to the murder, Glenda noticed that Everett "was not completely himself" because of his drug use. She tried to talk to him "about his problem and he just couldn't seem to get it altogether. He wanted to; he tried more than one try at a time, he just couldn't seem to get control of everything." Glenda noticed some personality changes in Everett since he started using drugs, but "not to the extent that [she] thought he would ever be capable of doing something like this." Glenda "very seldom saw

29

[Everett] drink alcohol," but she knew that he "[s]ometimes . . . would drink a little alcohol."

On the other hand, Glenda also testified that, as an adult, Everett was "a very loving and caring person.  That's always the way he has always been.  He has never been a violent person of this nature of any kind."  Glenda opined that for Everett to have done "something as horrendous as this is, there would have to be drugs involved.  He's a very loving, caring person in other cases."  For example, Everett's nieces and nephews loved their "Uncle Paul" because he would play and cuddle with them.

2.     Cindy Grider

Grider, one of Everett's sisters, testified that she and Everett were "very close," and she saw or heard from him almost every day when he was living in northern Alabama.  Everett was wonderful with her kids, would babysit them, and would play with them, and they missed their "Uncle Paul."  Everett always was "wonderful" with his entire family and with other people in general.  Like his "very caring" father, Everett would "give somebody the shirt off of his back."

Grider further testified that the reaction in Everett's hometown to his arrest was "[s]hock"—no one could believe that "the Paul that they knew" was capable of the crimes for which he was arrested.  They all kept asking Grider "who was he with [at the time], because there's no way."  Grider believed that, "[w]ithout some

30

influence from somewhere . . . , [Everett] could have never done this." Grider had never known Everett to be violent, not even during times that the family knew "something was wrong" with him.

Grider, however, was aware that Everett was involved in drugs, as were the people he spent time with, including Farmer and Farmer's family. She tried "plenty of times" to get Everett to go to counseling or seek help for his drug use, but he would only "say what [she] wanted to hear" in response.

3.    Smith's Closing Argument

In closing, defense counsel Smith largely focused on the argument that the State had not proven the existence of any aggravating circumstance. Specifically, Smith asserted: (1) Everett was not under a sentence of imprisonment at the time of the murder because he was not actually in prison when he committed the crimes; (2) the murder was not particularly heinous, atrocious, or cruel because it was not committed with an utter indifference to Bailey's suffering or a torturous design; and (3) the murder was not committed during the commission of a sexual battery because Everett already had inflicted Bailey's fatal injuries when he raped her. Smith also argued that Everett was a "young kid" who had made a senseless, tragic, and indefensible decision but who was not worthy of the death penalty.

**D.    Penalty Trial Before the Sentencing Court**

After the jury recommended a death sentence, the state trial court held a Spencer[8] hearing.  The State did not introduce any evidence or call any witnesses. Everett called his mother Glenda and investigator Jordan to testify.  Glenda testified that, although Everett was twenty-two years old at the time of his crimes, his maturity level did not match his chronological age.  Everett always acted young for his age and never really supported himself or lived on his own.  Jordan testified that he reviewed the jail records from Everett's pre-trial incarceration and found no indication that any disciplinary action was ever taken against Everett.  Everett declined to offer a statement to the court.

The state trial court sentenced Everett to death for Bailey's murder.  The court found the existence of three statutory aggravating factors, specifically that the murder: (1) was committed while Everett was under a sentence of imprisonment for a previous felony conviction, Fla. Stat. § 921.141(5)(a); (2) was committed while Everett was engaged in the commission of a sexual battery or a burglary, id. § 921.141(5)(d); and (3) was especially heinous, atrocious, or cruel, id. § 921.141(5)(d).  The court found four statutory mitigating factors but accorded them little to very little weight: (1) Everett's age, id. § 921.141(6)(g); (2) the crime

_____

[8]Spencer v. State, 615 So. 2d 688, 690-91 (Fla. 1993) (providing that, after a jury has recommended a sentence but before the trial court imposes a sentence, the court should hold a hearing to afford all parties an opportunity to be heard, allow the presentation of additional evidence, and allow both sides to comment on or rebut information in any presentence or medical report).

32

was committed while under the influence of some type of substance, id.

§ 921.141(6)(b);[9] (3) lack of significant history of prior criminal activity, id.

§ 921.141(6)(a); and (4) Everett's family background and his drug use, id.

§ 921.141(6)(h).  As to Everett's family background, the trial court noted his

father's alcoholism and his parents' divorce, remarriage, and second divorce.  The

court found that Everett's upbringing, while not "ordinary," was not a "deprived

one."  The court also found non-statutory mitigating factors, each of which

received very little weight: (1) Everett's remorse, as expressed in his November 27

confession; (2) Everett's good conduct in custody; (3) the alternative punishment

of life imprisonment without parole; and (4) Everett's confession.  Finding that the

aggravating circumstances outweighed the mitigating circumstances, the trial court

imposed a sentence of death.

## III.  DIRECT APPEAL

Everett appealed to the Florida Supreme Court.  See Everett v. State, 893

So. 2d 1278 (Fla. 2004) ("Everett I").  Everett argued, among other things, that the

trial court should have suppressed the DNA samples and his November 27

---

[9]The trial court rejected the argument that Everett was under the influence of an extreme mental or emotional disturbance caused by a hallucinogenic drug at the time of the offenses because Everett was able to go to and enter Bailey's home, burglarize her home, rape and murder her, and later recall specific details regarding these events.  The court, however, found that it was reasonably established that Everett was under the influence of some type of substance.

confession because they were obtained in violation of his Fifth Amendment rights. Id. at 1282-83.

The Florida Supreme Court affirmed Everett's first-degree murder conviction and death sentence. Id. at 1280. On the Fifth Amendment claim, the Florida Supreme Court found that law enforcement officers contacted Everett on two separate occasions after he had invoked his right to counsel under Miranda, first, to obtain his consent to provide DNA samples, and second, to serve him with an arrest warrant. Id. at 1283.

The Florida Supreme Court identified the question as "whether a law enforcement officer's request for a consent to search from, or service of an arrest warrant on, a defendant in custody who has invoked the right to counsel violates the Fifth Amendment." Id. at 1285. The Florida Supreme Court then cited and discussed at length the Supreme Court decisions in Miranda; Edwards v. Arizona, 451 U.S. 477, 101 S. Ct. 1880 (1981); Arizona v. Roberson, 486 U.S. 675, 108 S. Ct. 2093 (1988); Rhode Island v. Innis, 446 U.S. 291, 100 S. Ct. 1682 (1980); Michigan v. Mosley, 423 U.S. 96, 96 S. Ct. 321 (1975); Schmerber v. California, 384 U.S. 757, 86 S. Ct. 1826 (1966); and others. Everett I, 893 So. 2d at 1283-86.

The Florida Supreme Court pointed out that "Miranda requires that once a defendant has invoked the right to counsel during questioning, no further interrogation of that individual in custody is permitted, unless counsel is present."

34

Id. at 1284.  The Florida Supreme Court also stressed that the Supreme Court "did not require counsel's presence for all further communications; only for interrogations."  Id.

The Florida Supreme Court then discussed Innis, where the Supreme Court considered what constitutes "interrogation" for these purposes.  Id.  The Florida Supreme Court quoted from Innis at length, including Innis's discussion of what constitutes interrogation.  Id. at 1284-85.  The Florida Supreme Court noted the Supreme Court's conclusion that "the character of interrogation 'must reflect a measure of compulsion above and beyond that inherent in custody itself,'" id. at 1284 (quoting Innis, 446 U.S. at 300, 100 S. Ct. at 1689), and the Supreme Court's definition of the term interrogation as "express questioning or its functional equivalent," as follows:

> "[T]he Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent.  That is to say, the term "interrogation" under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."

Id. (quoting Innis, 446 U.S. at 300-01, 100 S. Ct. at 1689-90).

The Florida Supreme Court added that the Supreme Court in Edwards provided further guidelines regarding the boundaries of custodial interrogation.  Id. at 1285.  The Florida Supreme Court explained that, in Edwards, "[t]he [Supreme]

35

Court reiterated 'that an accused, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, <u>unless the accused himself initiates further communication, exchanges, or conversations with the police</u>.'" <u>Id.</u> (quoting <u>Edwards</u>, 451 U.S. at 484-85, 101 S. Ct. at 1885) (alteration adopted).

The Florida Supreme Court also cited and discussed <u>Roberson</u>. <u>See id.</u> After analyzing both <u>Innis</u> and <u>Roberson</u>, the Florida Supreme Court concluded that "[t]he police are not forbidden all contact with a defendant in custody; in fact, the [Supreme] Court expressly exempted from the definition of 'interrogation' routine police contact 'normally attendant to arrest and custody.'" <u>Id.</u> (quoting <u>Innis</u>, 446 U.S. at 301, 100 S. Ct. at 1689).

After considerable review of Supreme Court precedent, the Florida Supreme Court concluded that the service of the arrest warrant and the request for consent to provide DNA samples did not constitute interrogation because neither involved a word or action that the police should know is reasonably likely to elicit an incriminating response. <u>Id.</u> at 1286. Specifically, the service of the arrest warrant was a routine police procedure and it did not require a response from Everett. <u>Id.</u> The request for consent to provide DNA samples was the same request the officers had made of several other individuals whom they had not been able to eliminate

36

from a list of potential suspects in Bailey's murder.  Id.  The Florida Supreme Court concluded that the DNA request was "not reasonably likely to elicit an incriminating response."  Id.

The United States Supreme Court denied Everett's petition for certiorari. Everett v. Florida, 544 U.S. 987, 125 S. Ct. 1865 (2005).

## IV.  STATE COLLATERAL PROCEEDINGS

### A.    Motion for Post-Conviction Relief

In 2006, Everett filed a motion for post-conviction relief pursuant to Florida Rule of Criminal Procedure 3.851.  Among other claims, Everett alleged that he received ineffective assistance of counsel in connection with the investigation and presentation of mitigating evidence, including drug abuse evidence, for the penalty phase of the trial.[10]

### B.    State 3.851 Evidentiary Hearing

In 2008, the state 3.851 court held an evidentiary hearing.  Six witnesses presented testimony relevant to Everett's claim of ineffective counsel in the penalty phase: (1) Glenda, Everett's mother; (2) Grider, Everett's sister; (3) Ashley Malone, one of Everett's other sisters; (4) Everett himself; (5) Dr. Umesh Mhatre,

---

[10]Everett alleged ineffective assistance of penalty phase counsel as two claims.  For ease of discussion, we refer to his allegations as a single claim.

a psychiatrist; and (6) Walter Smith, Everett's trial counsel.  We outline their 3.851 testimony.

1.    Glenda Everett

Glenda testified that she told Everett's defense team in preparation for the penalty phase trial that Everett was a good, non-violent child and that the family had moved around a lot while he was growing up.  Glenda testified as to the specifics of the family's moves, explaining that she and Sidney had marital problems because of his drinking.  She and Sidney first divorced in 1984, after which she and her children moved from Fort Payne, Alabama, to Sylvania, Georgia, where Everett started kindergarten.

After about a year and a half, in January 1986, while Everett was in the first grade, Glenda and the children moved back to Fort Payne when she and Sidney remarried.  Then, in November 1986, Glenda again moved herself and the children back to Sylvania, where Everett attended the same school that he had before.

Around the beginning of the next school year, Glenda and her children returned to Fort Payne.  In 1987 to 1988, Everett attended the same school as before, and the family remained for a full school year.  Glenda and Everett then moved back to Sylvania after the end of that school year.  Everett was able to make friends with other children, but his friendships were interrupted by the moves.

38

Glenda further testified that Sidney "spent a lot of time with [Everett]," but she did not consider Sidney to be a good influence on him. When he was fourteen years old, Everett moved in with his father, and he eventually dropped out of school. In her testimony, Glenda indicated that Smith had not asked her a lot of questions about this part of Everett's life and that he had interviewed her only once.

On cross-examination, Glenda admitted that she could not tell when Everett was on drugs and when he was not. But she did become aware that he "was into drugs real heavy" not long before the murder.

2.    Cindy Grider

Everett's sister Grider, who is six years older than Everett, confirmed that the family moved a lot while he was growing up. At some point, she became aware that Everett was "going down the wrong path," which included drug use. On many occasions, Grider spoke "very frankly" with Everett concerning his drug use and his friends, whom Grider did not consider to be good influences. Grider also did not consider Sidney, who "drank," to have been a good influence on Everett. Grider had never seen her brother be violent, including when he was on drugs. As to Smith's mitigation investigation, Grider did not recall Smith ever formally interviewing her, and Smith had only one "very brief conversation" with her.

39

3.    Ashley Malone

Everett's sister Malone, who is four years older than Everett, is the closest of his sisters in age to him. She stated that the family moves during Everett's childhood were hard on him and his siblings, but he managed to maintain friendships throughout the moves. In around 2000 or 2001, Malone became aware that Everett was using drugs, but she never saw him do anything violent, including while on drugs. Smith never interviewed Malone during his mitigation investigation.

4.    Paul Everett

With regard to Smith's mitigation investigation, Everett testified that Smith did not bring up mitigating factors with Everett until they were about to go to trial, and Smith did very little to establish mitigating factors beyond "briefly speaking with [Everett's] family." Although Smith had Dr. Rowan meet with Everett, Dr. Rowan and Everett met for only "30, 45 minutes tops." Basically, Dr. Rowan asked Everett about his childhood history, where he went to school, and "a little bit about [his] case." Her emphasis in interviewing him was on his ability to stand trial, and she did not go into any great length about his background.

Everett further testified that Smith never asked him about his problems with drugs. Given that he was steadily drinking alcohol from the age of seven or eight, Everett believed that Smith should have looked into his history with drugs and the

40

effect that certain substances may have had on his brain development as a child. Everett started smoking marijuana around age twelve or thirteen. By the age of sixteen, he was "eating LSD every day, injecting methamphetamine every day." Although drugs were "pretty much an every day thing" for him, he kept his drug use hidden from his family for several years.

As to his two-week stay in Panama City leading up to the murder, Everett testified that he was using cocaine, methamphetamine, LSD, and ecstasy. In the hours leading up to the murder, Everett was using cocaine and methamphetamine together. Using cocaine and methamphetamine together would cause Everett to experience "intense paranoia of the police," where he felt that he was being watched or followed by law enforcement. He was also experiencing paranoia at the time because he had been manufacturing methamphetamine. When asked whether the paranoia would ever prompt him to commit violence, Everett initially testified, "No," but then immediately stated that he could not really say because "when it gets to that point it's self-preservation not wanting to go to jail." Everett admitted that he never discussed his drug-induced paranoia with either Smith or Dr. Rowan.

5.    Dr. Umesh Mhatre

Dr. Mhatre, a psychiatrist who had done "a lot of death row evaluation," met with Everett on October 16, 2007 for about an hour. Dr. Mhatre testified as to the

41

history of substance abuse that Everett reported during his interview. Specifically, Everett told Dr. Mhatre that Sidney gave him his first beer at around eight years old and that Everett sometimes would drink between twelve and eighteen beers a day. At some point, Everett started drinking hard liquor, which he found difficult to handle. At twelve years old, Everett started abusing marijuana, and he subsequently started using LSD, powder cocaine, crack cocaine, crystal methamphetamine, ecstasy, and pain pills.

Everett also reported to Dr. Mhatre that, during his trip to Panama City at the time of the murder, he was cooking crystal methamphetamine every day, was high on drugs throughout the trip, and had not slept in several days. Everett also claimed that, in the week leading up to the murder, he used about half an ounce of methamphetamine, five ounces of marijuana, one gram of powder cocaine, one gram of crack cocaine; had done six to seven hits of LSD; and had consumed twelve beers a day. Dr. Mhatre testified that the crystal methamphetamine would have acted as a stimulant to Everett and could have caused significant paranoia. Most of the drugs that Everett was on were well known to cause paranoia, hallucinations, and delusions.

Dr. Mhatre believed that Everett's reported drug use on the day of the crimes was consistent with Everett's history of drug use and Everett's claim that he

42

committed the crimes in a state of drug-induced paranoia.  Specifically, Everett

reported to Dr. Mhatre that, on the day of the murder,

> he was getting increasingly paranoid and when the victim accidentally
> got into [his motel] room looking for somebody, the paranoia just
> went off the roof, he started thinking she was a law enforcement,
> trying to get her, trying to track her down, ran into her unfortunately
> later on while she was jogging, followed her and stalked her and [was]
> convinced, and . . . [his] initial purpose to go [to the victim's house]
> was to find out . . . if she does, in fact, belong to law enforcement.

Dr. Mhatre conceded that he was not able to corroborate Everett's claims

concerning his drug use or Everett's claim that he was in a drug-induced psychosis

at the time of the murder through police officers' reports or other witnesses.

Dr. Mhatre did not conduct any psychological testing of Everett, and indeed,

he was not qualified to administer such tests.  Dr. Mhatre did speak to Everett's

mother and two of Everett's sisters as part of his evaluation of Everett, and he

testified as to the information obtained from these interviews.  Glenda told Dr.

Mhatre that she and Sidney fought a lot in front of the children, which she believed

had "a big impact on all of her children, possibly especially on [Everett]."  Glenda

reported that Everett "was like a different person" when he was on drugs and that

he was never violent except when he was on drugs, which caused him to have "a

bit of a temper."  Dr. Mhatre also confirmed through the interviews that Sidney

was an alcoholic, but Everett did not report any particularly positive or negative

feelings about Sidney.

43

6.      Walter Smith

Everett's trial counsel, Smith, testified regarding his extensive legal experience and his pre-trial investigation of mitigation factors in Everett's case.[11] At the time of the 2008 evidentiary hearing before the 3.851 court, Smith had been an attorney for twenty-eight years, including around fifteen years with the Public Defender's Office.  He represented defendants in forty-one first-degree murder trials, twenty of which were death penalty cases.  Four of his clients received death sentences, two of which were upheld by the Florida Supreme Court.  Smith had never used co-counsel, but he did utilize an investigator.  Most of Smith's defendants suffered from some kind of mental health issue, and based on consultations with psychologists, Smith was "pretty dead on" in recognizing and identifying potential mental health issues in his clients.

## C.      State 3.851 Court Order

On July 17, 2008, the 3.851 court issued an order making factual findings and denying Everett's 3.851 motion.  As to Everett's claim of ineffective counsel in the penalty phase, the 3.851 court first rejected Everett's allegation that Smith failed to adequately investigate mitigating circumstances and improperly relied on his alcoholic father to secure mitigating evidence.  The 3.851 court found that

---

[11]See discussion supra Part II.A.

44

Smith was an extremely experienced defense attorney who did investigate, find, and present mitigating evidence in Everett's case.

Specifically, after facing difficulty obtaining mitigation information from Everett's family, Smith and his investigator traveled to Alabama in attempt to locate mitigating evidence and also obtained Everett's pre-trial incarceration records. Contrary to Everett's allegation that Smith did not consult with a psychological or psychiatric professional, Smith had Dr. Rowan examine Everett. At the penalty phase hearing, Smith presented the testimony of Glenda and Grider, who testified regarding Everett's background and drug use. The 3.851 court found that "Smith did the best he could with the type of information he had available to him."

As to Everett's drug use, the 3.851 court found that, in light of the constant references to drug use by Everett in the trial record, Everett's claim that Smith failed to adequately investigate his drug use was not credible. Smith presented testimony concerning Everett's drug use in the penalty phase in an attempt to avoid the death penalty, and the testimony of Everett's three family members about his drug use during the evidentiary hearing was essentially the same evidence presented during the penalty phase. Accordingly, Everett had not shown that Smith failed to discover evidence about his drug use that would have changed the outcome of his penalty-phase hearing.

The 3.851 court further found that Everett failed to show that Dr. Mhatre's testimony would have changed the outcome of his penalty-phase hearing. The 3.851 court noted that Dr. Mhatre's opinion—concerning the effect of Everett's drug use on his behavior the day of murder—rested entirely on information provided by Everett, and Dr. Mhatre was not able to corroborate any of that information from officers' reports or other witnesses. By the time of trial, Smith was aware that Everett had come up with a story about Bailey's death similar to what Everett subsequently told Dr. Mhatre, and Smith attempted unsuccessfully to verify the story. For example, Smith determined that Bubba was an actual person and learned that Bubba was in a cast at the time of the murder. Thus, Smith had utilized the information he had available to him during the penalty phase of the trial to the best of his ability.

## D.    Florida Supreme Court Decision

Everett appealed, and on February 10, 2011, the Florida Supreme Court issued a revised opinion affirming the denial of Everett's Rule 3.851 motion. See Everett v. State, 54 So. 3d 464 (Fla. 2010) ("Everett II").

The Florida Supreme Court correctly noted that Everett's claims of ineffective counsel were governed by the two-prong standard in Strickland v. Washington. Id. at 471-72 (citing Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984) (requiring a petitioner alleging ineffective counsel to show both

deficient performance and prejudice)).  The Florida Supreme Court separately considered and rejected each of Everett's four main contentions concerning Smith's alleged ineffectiveness during the penalty phase.  See id. at 479-85.

First, the Florida Supreme Court concluded that Everett showed neither deficient performance nor prejudice as to his claim that Smith relied on Everett's alcoholic father and failed to look elsewhere for mitigation especially after his father's death.  Id. at 479-80.  The Florida Supreme Court agreed with the 3.851 court that Smith extensively searched for mitigation evidence and was not able to find mitigation beyond the testimonies of Everett's mother and sister.  Id.  The Florida Supreme Court added that Everett presented little evidence at his post-conviction hearing that Smith failed to present at trial.  Id. at 480.  Although Everett presented Dr. Mhatre's testimony concerning his drug-induced paranoia and its role in his violent behavior, Dr. Mhatre conceded that his opinion was based solely on Everett's statements, and Dr. Mhatre did not opine that the paranoia rose to the level of statutory mental health mitigation.  Id. at 480.  The Florida Supreme Court reasoned that Everett had "the burden of showing that counsel's ineffectiveness deprived him of a reliable penalty phase proceeding," but that "Everett did not do so."  Id. (quotation omitted and alteration adopted).

Second, the Florida Supreme Court rejected Everett's argument that Smith failed to present evidence that Everett lacked a male role model other than his

47

alcoholic father and that he had an unstable upbringing because his family moved a lot. Id. at 480-81. The court determined that the evidence presented at the post-conviction evidentiary hearing concerning these circumstances was essentially cumulative to the evidence presented during the penalty hearing. Id. at 481. Specifically, evidence during both hearings "showed that Everett's father was an alcoholic and acted inappropriately toward Everett at times; that Everett loved his father; and that Everett moved several times as a result of his parents' divorce, remarriage, and second divorce." Id. Therefore, Everett had shown neither deficient performance nor prejudice under Strickland. Id.

Third, the Florida Supreme Court concluded that Everett's next claim—that Smith failed to consult with a psychological or psychiatric professional—was "factually incorrect" because Smith in fact had Dr. Jill Rowan examine Everett. Id. at 482. To the extent that Everett claimed that Smith should have called Dr. Rowan to testify as a mitigation expert, Smith did not perform deficiently because Dr. Rowan's findings were not favorable to Everett's case. Id. Everett likewise did not show prejudice because the record indicated that the evidence presented at the post-conviction evidentiary hearing would not have changed the balance of aggravation and mitigation. Id. at 482-83. Although Dr. Mhatre's testimony may have been relevant to the statutory mitigating circumstance of whether Everett acted under the influence of extreme mental or emotion disturbance, Dr. Mhatre's

48

theory about Everett's drug-induced paranoia was undermined by the facts in Everett's case.  Id.  Specifically, the evidence showed that Everett deliberately entered and burglarized Bailey's home, raped and murdered her, and subsequently was able to recall clearly the factual circumstances of the crimes.  Id. at 483.

Fourth, the Florida Supreme Court concluded that Everett demonstrated neither deficient performance nor prejudice with his argument that Smith should have presented more evidence of his drug use during the penalty phase.  Id. at 483-85.  The Florida Supreme Court concluded, as the 3.851 court had found, that Smith properly investigated and presented evidence of Smith's drug use during the penalty phase.  Id. at 484.  Although the evidence produced at the evidentiary hearing may have provided more detail about Everett's drug use, the testimony of Everett's mother and two sisters at the post-conviction hearing was substantially cumulative to the evidence presented during the penalty phase.  Id. at 484-85.  In any event, the Florida Supreme Court determined that the additional testimony at the post-conviction hearing "did not undermine confidence in the trial."  Id. at 485.

## V.  FEDERAL HABEAS PROCEEDINGS

On March 21, 2011, Everett filed pro se a federal habeas petition under 28 U.S.C. § 2254.  After the district court appointed counsel, counsel filed an amended § 2254 petition.  As amended, Everett's petition raised several grounds for relief, including that (1) his Fifth Amendment rights were violated by the

49

failure to suppress his November 27 confession and the DNA samples obtained by law enforcement after he invoked his right to counsel; and (2) trial counsel rendered ineffective assistance in the investigation and presentation of mitigation evidence during his penalty-phase trial.

On March 28, 2014, the district court issued a 108-page order denying Everett's amended § 2254 petition and discussing at length both of the above claims. The district court concluded that the Florida Supreme Court's rejection of the claims resulted in neither an unreasonable application of clearly established Supreme Court precedent nor an unreasonable determination of the facts. As to the Fifth Amendment claim, the record showed that the officers honored Everett's invocation of his right to counsel but that Everett then waived his right to counsel and confessed. As to the claim of ineffective penalty-phase counsel, the record demonstrated that Smith was not deficient in investigating possible mitigation evidence and that Everett suffered no prejudice. Everett timely appealed.

## VI. STANDARD OF REVIEW

Everett's federal habeas petition is governed by 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Recognizing that "[s]tate courts are adequate forums for the vindication of federal rights . . . , AEDPA erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court."

50

Burt v. Titlow, 571 U.S. ___, ___, 134 S. Ct. 10, 15-16 (2013).  The "purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction."  Greene v. Fisher, 565 U.S. ___, ___, 132 S. Ct. 38, 43 (2011) (quotation omitted).  With this background, AEDPA permits federal courts to grant habeas relief in only two limited circumstances after a state court has denied relief.  See 28 U.S.C. § 2254(d).

First, § 2254(d)(1) permits a federal court to grant habeas relief when the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  The phrase "clearly established Federal law" refers "to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision."  Williams v. Taylor, 529 U.S. 362, 412, 120 S. Ct. 1495, 1523 (2000).

A circuit court "may, in accordance with its usual law-of-the-circuit procedures, look to circuit precedent to ascertain whether it has already held that the particular point in issue is clearly established by Supreme Court precedent."  Marshall v. Rodgers, 569 U.S. ___, ___, 133 S. Ct. 1446, 1450 (2013).  However, circuit precedent may not be used "to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that [the Supreme Court]

51

has not announced." Id.  Also, a circuit court "may not canvass circuit decisions to determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to [the Supreme Court], be accepted as correct." Id. at ___, 133 S. Ct. at 1451.

The phrase "contrary to" means that the state court decision contradicts the United States Supreme Court on a settled question of law or holds differently than did the Supreme Court on a set of materially indistinguishable facts. Lockyer v. Andrade, 538 U.S. 63, 73, 123 S. Ct. 1166, 1173 (2003).  The pivotal question in most federal habeas cases is whether the state court's application of clearly established federal law was unreasonable. Harrington v. Richter, 562 U.S. ___, ___, 131 S. Ct. 770, 785 (2011).  "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by [the U.S. Supreme Court]." Knowles v. Mirzayance, 556 U.S. 111, 122, 129 S. Ct. 1411, 1419 (2009) (quotation omitted). "An unreasonable application of federal law is different from an incorrect application of federal law," Williams, 529 U.S. at 410, 120 S. Ct. at 1522; indeed, "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable," Harrington, 562 U.S. at ___, 131 S. Ct. at 786.  We may issue a writ of habeas corpus only when "the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error

well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington, 562 U.S. at ___, 131 S. Ct. at 786-87. As long as "some fairminded jurists could agree with the state court's decision, although others might disagree, federal habeas relief must be denied." Loggins v. Thomas, 654 F.3d 1204, 1220 (11th Cir. 2011).

Second, § 2254(d)(2) allows a federal court to grant habeas relief when the state court decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). As the Supreme Court recently reiterated, "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." Titlow, 571 U.S. at ___, 134 S. Ct. at 15 (quotation and citations omitted). "[E]ven if reasonable minds reviewing the record might disagree about the [fact] finding in question, on habeas review that does not suffice to supersede the [state] trial court's determination." Wood v. Allen, 558 U.S. 290, 301, 130 S. Ct. 841, 849 (2010) (quoting Rice v. Collins, 546 U.S. 333, 341-42, 126 S. Ct. 969, 976 (2006)) (alterations omitted).

In short, the standard of § 2254(d) is "difficult to meet . . . because it was meant to be." Titlow, 571 U.S. at ___, 134 S. Ct. at 16 (quotation omitted). This "highly deferential standard" demands that "[t]he petitioner carries the burden of proof," Cullen v. Pinholster, 563 U.S. ___, ___, 131 S. Ct. 1388, 1398 (2011)

53

(quotations omitted), and "that state-court decisions be given the benefit of the doubt," Woodford v. Visciotti, 537 U.S. 19, 24, 123 S. Ct. 357, 360 (2002).

## VII.  FIFTH AMENDMENT MIRANDA CLAIM

Relying primarily on Edwards, Innis, and Roberson, Everett argues that once he invoked his right to counsel under Miranda on November 14, 2001, the police officers were totally prohibited from ever having any further communication or dealings with him without counsel present.  Everett contends that this absolute prohibition requires suppression of his November 27 confession and renders his written consent to the DNA samples legally ineffective and thus invalid.  As to the DNA, Everett argues this absolute prohibition applies regardless of whether the police DNA request constituted interrogation and regardless of whether the police sought testimonial evidence.

Alternatively, even if the Supreme Court has not extended the right to counsel under the Fifth Amendment beyond interrogation, Everett argues that the record in this case shows that the police officers did interrogate Everett in violation of his Fifth Amendment rights.  Based largely on Innis and Roberson, Everett contends that the police subjected him to interrogation surrounding the request for DNA consent and the service of the warrant as part of a method of "indirect interrogation" that involved "psychological ploys" meant to break his will.

54

We review the relevant Supreme Court case law regarding invocation of the right to counsel, custodial interrogations, DNA requests, and the Fifth Amendment's protection of testimonial communications.  We then examine whether the Florida Supreme Court's decision—concluding no Fifth Amendment violation occurred in Everett's case—was contrary to, or an unreasonable application of, clearly established federal law as shown in Supreme Court holdings.

### A.    <u>Miranda</u> and Its Progeny

Under the Fifth Amendment, no person "shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  Therefore, in <u>Miranda</u>, the Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."  384 U.S. at 444, 86 S. Ct. at 1612.  Thus, when an individual is taken into custody and subjected to questioning, police must warn him prior to any questioning that he has the rights to remain silent and to the presence of an attorney.  <u>Id.</u> at 478-79, 86 S. Ct. at 1630.

Then, in <u>Mosley</u>, the Supreme Court held that "the admissibility of statements obtained after the person in custody has decided to remain silent depends under <u>Miranda</u> on whether his right to cut off questioning was scrupulously honored."  <u>Mosley</u>, 423 U.S. at 104, 96 S. Ct. at 326.  The Supreme

Court concluded that the defendant's "right to cut off questioning" was fully respected in this case because police immediately ceased the initial interrogation after the defendant invoked his right to silence, resumed questioning only after the passage of a significant period of time and the provision of a fresh set of warnings, and restricted the second interrogation to a crime that had not been a subject of the earlier interrogation.  Id. at 104-06, 96 S. Ct. at 326-27.[12]

1.    The Edwards Rule

Subsequently, in Edwards, 451 U.S. 477, 101 S. Ct. 1880, the Supreme Court "set forth a 'bright-line rule' that all questioning must cease after an accused requests counsel."  Smith v. Illinois, 469 U.S. 91, 98, 105 S. Ct. 490, 494 (1984).  Specifically, once the accused has "expressed his desire to deal with the police only through counsel," he should not be "subject to further interrogation by the authorities until counsel has been made available to him, unless [he] himself initiates further communication, exchanges, or conversations with the police."  Edwards, 451 U.S. at 484-85, 101 S. Ct. at 1885.[13]  Thus, the Edwards rule

---

[12]In Mosley, a police officer advised the defendant of his Miranda rights and interrogated him concerning some robberies, but the officer promptly ceased the interrogation when the defendant said he did not wish to answer any questions.  Mosley, 423 U.S. at 97, 96 S. Ct. at 323.  However, several hours later, another officer advised the defendant of his Miranda rights and questioned him about a different crime, a homicide, prompting Mosely to make an incriminating statement.  Id. at 97-98, 96 S. Ct. at 323-24.

[13]In Edwards, the defendant requested counsel after police took him into custody and started interrogating him.  451 U.S. at 478-79, 101 S. Ct. at 1881-82.  The police stopped interrogating the defendant at that point, but they reinitiated questioning the following morning,

56

involves two separate inquiries: first, "whether the accused actually invoked his right to counsel"; and second, "if the accused invoked his right to counsel, courts may admit his responses to further questioning only on finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked."  Smith, 469 U.S. at 95, 105 S. Ct. at 492-93.

With respect to the waiver inquiry, "a valid waiver . . . cannot be established by showing only that [the accused] responded to further police-initiated custodial interrogation even if he has been advised of his rights."  Edwards, 451 U.S. at 484, 101 S. Ct. at 1884-85.  Rather, for a waiver to be voluntary, knowing, and intelligent, (1) "the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception"; and (2) "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."  Moran v. Burbine, 475 U.S. 412, 420-21, 106 S. Ct. 1135, 1140-41 (1986) (discussing the waiver of a suspect's Miranda rights to be "fully apprise[d] . . . of the State's intention to use his statements to secure a conviction, and . . . to remain silent and to have counsel

---

prompting the defendant to confess his crime.  Id. at 479, 101 S. Ct. at 1882.  The defendant did not reinitiate further communications, exchanges, or interactions with the police.  See id.  The Supreme Court held that the admission of the defendant's confession against him at trial violated the Fifth and Fourteenth Amendments as construed in Miranda.  Id. at 480, 101 S. Ct. at 1882-83.

57

present if he so desires" (quotation omitted and alterations adopted)).  For a court to conclude that a defendant waived his Miranda rights, the totality of the circumstances surrounding the interrogation must reveal both an uncoerced choice and the requisite level of comprehension.  Id.

"[O]ne, but not the only, measure of the voluntariness of a defendant-initiated confession is the . . . measure of whether a sufficient period of time has elapsed since the termination of police questioning for the defendant to have rationally reflected on the choice before him."  Henderson v. Singletary, 968 F.2d 1070, 1074 (11th Cir. 1992).  Where a defendant initiated further conversation with the police, "[c]ourts must . . . satisfy themselves that the defendant-initiated confession was not the product of improper police questioning or pressure."  Id. Moreover, "even if a conversation taking place after the accused has expressed his desire to deal with the police only through counsel, is initiated by the accused, where reinterrogation follows, the burden remains upon the prosecution to show that subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation."  Oregon v. Bradshaw, 462 U.S. 1039, 1044, 103 S. Ct. 2830, 2834 (1983) (plurality) (quotation omitted).

In Roberson, the Supreme Court reaffirmed the bright-line Edwards rule that, after a person in custody invokes the right to counsel, the police may not subject him "to further interrogation . . . until counsel has been made available to

58

him, unless the accused himself initiates further communication, exchanges, or conversations with the police." Roberson, 486 U.S. at 680-82, 108 S. Ct. at 2097-98 (emphasis added and quotation omitted).

2.    The Meaning of "Interrogation" under Miranda

In Innis, 446 U.S. 291, 100 S. Ct. 1682, the Supreme Court defined the meaning of "interrogation" under Miranda. In that case, police officers advised the defendant of his Miranda rights upon arresting him on the street in connection with a robbery and murder committed with a sawed-off shotgun, and the defendant stated that he wanted to speak with a lawyer. Innis, 446 U.S. at 294, 100 S. Ct. at 1686. Immediately thereafter, while transporting the defendant to the police station, three officers had a conversation among themselves concerning the possible danger posed to "handicapped" children playing in the area by the missing murder weapon. Id. at 294-95, 100 S. Ct. at 1686-87. Overhearing this, the defendant interrupted the conversation and instructed the officers to return to the scene of his arrest, where he directed them to the location of the murder weapon out of concern for "the kids in the area." Id. at 295, 100 S. Ct. at 1687 (quotation omitted).

On certiorari review, the Supreme Court concluded that the defendant had not been "interrogated" within the meaning of Miranda. Id. at 302-03, 100 S. Ct. at 1690-91. The Supreme Court held that "the term 'interrogation' under Miranda

59

refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Id. at 301, 100 S. Ct. at 1689-90 (emphasis added) (alteration in original) (quoting Miranda, 384 U.S. at 444, 86 S. Ct. at 1612).[14]

In defining "interrogation" in Innis, the Supreme Court noted that the concern of the Miranda Court "was that the 'interrogation environment' created by the interplay of interrogation and custody would 'subjugate the individual to the will of his examiner' and thereby undermine the privilege against compulsory self-incrimination." Id. at 299, 100 S. Ct. at 1688. The police "techniques of persuasion" that caused this concern extended beyond "express questioning" and included the use of "coached witnesses," as follows:

> For example, one of the practices discussed in Miranda was the use of line-ups in which a coached witness would pick the defendant as the perpetrator. This was designed to establish that the defendant was in fact guilty as a predicate for further interrogation. A variation on this theme discussed in Miranda was the so-called "reverse line-up" in which a defendant would be identified by coached witnesses as the

---

[14]In Pennsylvania v. Muniz, 496 U.S. 582, 110 S. Ct. 2638 (1990), the Supreme Court recognized a "routine booking exception" to Miranda's coverage for questions to secure the defendant's "biographical data necessary to complete booking or pretrial services," such as questions regarding name, address, height, weight, eye color, date of birth, and current age. Muniz, 496 U.S. at 600-02, 110 S. Ct. at 2649-50 (quotation omitted). The Supreme Court reasoned that, where such questions are "requested for record-keeping purposes only" and therefore "appear reasonably related to the police's administrative concerns," the questions "fall outside the protections of Miranda and the answers thereto need not be suppressed." Id. at 601-02, 110 S. Ct. at 2638.

perpetrator of a fictitious crime, with the object of inducing him to confess to the actual crime of which he was suspected in order to escape the false prosecution.  The Court in Miranda also included in its survey of interrogation practices the use of psychological ploys, such as to "posi[t]" "the guilt of the subject," to "minimize the moral seriousness of the offense," and "to cast blame on the victim or on society."  It is clear that these techniques of persuasion, no less than express questioning, were thought, in a custodial setting, to amount to interrogation.

Id. at 299, 100 S. Ct. at 1688-89 (emphasis added).

Thus, in Innis the Supreme Court held, "Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." Id. at 300-01, 100 S. Ct. at 1689.  In concluding that the officers' comments were not the functional equivalent of interrogation, the Supreme Court observed that nothing in the record suggested that the officers should have known that their conversation was reasonably likely to elicit an incriminating response from the defendant.  Id. at 302-03, 100 S. Ct. at 1690-91.

In addition to these cases discussing what constitutes "interrogation," we must also review the scope of the Fifth Amendment's privilege against self-incrimination.

3.    Scope of the Fifth Amendment Privilege against Self-Incrimination

The privilege against self-incrimination protects a person only against being incriminated by his own compelled "testimonial" communications. Doe v. United States, 487 U.S. 201, 207, 108 S. Ct. 2341, 2345 (1988) (quotation omitted and

61

emphasis added) (holding that the court-ordered signing of consent forms by the target of a grand jury investigation to authorize foreign banks to disclose records of his accounts was not testimonial). "[I]n order to be testimonial, an accused's communication must itself, explicitly or implicitly, relate a factual assertion or disclose information. Only then is a person compelled to be a 'witness' against himself." Id. at 210, 108 S. Ct. at 2347 (footnote omitted).

The Supreme Court has held that certain compelled acts, though incriminating, are not within the privilege against self-incrimination under the Fifth Amendment because they are not testimonial or of a communicative nature, including providing a handwriting exemplar, Gilbert v. California, 388 U.S. 263, 266-67, 87 S. Ct. 1951 (1967); furnishing a blood sample, Schmerber, 384 U.S. at 760-65, 86 S. Ct. at 1830-33;[15] providing a voice exemplar, United States v.

---

[15]Schmerber also raised a Fourth Amendment claim. Schmerber, 384 U.S. at 766, 86 S. Ct. at 1833. The Supreme Court held that the police officer did not violate Schmerber's Fourth Amendment rights by taking a blood sample without a warrant because, inter alia, the diminishing alcohol in Schmerber's blood presented an emergency and the threatened destruction of evidence. Id. at 770-71, 86 S. Ct. at 1835-36. In Missouri v. McNeely, 569 U.S. ___, 133 S. Ct. 1552 (2013), the majority held that the natural metabolization of alcohol in the bloodstream does not present a per se exigency that justifies an exception to the Fourth Amendment's warrant requirement for nonconsensual blood testing in all drunk-driving cases. Id. at ___, 133 S. Ct. at 1556. Instead, the McNeely majority held, exigency in this context must be determined case by case based on the totality of the circumstances. Id.

A number of state courts had interpreted Schmerber as a per se rule under the Fourth Amendment, see id. at ___, 133 S. Ct. at 1558 n.2, but the McNeely majority went to great lengths to interpret Schmerber as also using a "totality of the circumstances" approach. One state court has held that McNeely announced a new rule of law for purposes of state habeas petitions because it "broke new ground," Siers v. Weber, 2014 S.D. 51, ¶ 17 (S.D. 2014), and for this reason Westlaw has Schmerber flagged as abrogated by McNeely as recognized in Siers.

Dionisio, 410 U.S. 1, 7, 93 S. Ct. 764, 768 (1973); standing in a lineup, United States v. Wade, 388 U.S. 218, 222-23, 87 S. Ct. 1926, 1930 (1967); or wearing particular clothing, Holt v. United States, 218 U.S. 245, 252-53, 31 S. Ct. 2, 6 (1910).

Similarly, "the 'right' to counsel to protect the Fifth Amendment right against self-incrimination is not absolute."  Roberson, 486 U.S. at 686 n.6, 108 S. Ct. at 2100 n.6.  If police decide not to "provide counsel during a reasonable period of time in which investigation in the field is carried out, they may refrain from doing so without violating the person's Fifth Amendment privilege so long as they do not question him during that time."  Miranda, 384 U.S. at 474, 86 S. Ct. at 1628.

## B.    Everett's Consent to Provide DNA Samples

Turning to Everett's case, we address the Florida Supreme Court's decision as to the November 19 DNA samples and then as to his November 27 confession.

As to the DNA consent, Everett has not demonstrated that the Florida Supreme Court's decision—that the request for consent to collect DNA samples did not violate his Fifth Amendment rights—"was so lacking in justification that there was an error well understood and comprehended in existing law beyond any

---

However, based on the McNeely majority's analysis and purported following of Schmerber and related precedent, we do not read McNeely as abrogating, even in part, Schmerber.  In any event, Everett consented to the DNA sample, and this appeal does not involve a Fourth Amendment claim.

possibility for fairminded disagreement." Harrington, 562 U.S. at ___, 131 S. Ct. at 786-87.

First, although Everett twice invoked his right to counsel under Miranda while in custody, the Florida Supreme Court correctly concluded that the appointment of counsel was not required except for interrogation. Everett I, 893 So. 2d at 1284; see Edwards, 451 U.S. at 485-86, 101 S. Ct. at 1885 ("The Fifth Amendment right identified in Miranda is the right to have counsel present at any custodial interrogation. Absent such interrogation, there would have been no infringement of the right that Edwards invoked . . . ."). Simply put, the police officers were not forbidden contact with Everett that did not amount to interrogation—that is, express questioning or words or actions that the police should have known were reasonably likely to elicit a verbal incriminating response. See Innis, 446 U.S. at 301, 100 S. Ct. at 1689-90; Thompkins, 560 U.S. at 380-82, 130 S. Ct. at 2259-60. Indeed, the Supreme Court excludes from the definition of "interrogation" those police communications "normally attendant to arrest and custody." Innis, 446 U.S. at 301, 100 S. Ct. at 1689-90.

Second, the Florida Supreme Court also reasonably concluded that the request for DNA consent did not amount to interrogation. Everett I, 893 So. 2d at 1286. The privilege against self-incrimination extends only to compelled testimonial communications, which are those communications that relate a factual

64

assertion or disclose information.  Doe, 487 U.S. at 207, 210, 108 S. Ct. at 2345, 2347.  Thus, neither the furnishing of consent to collect DNA, nor the DNA evidence itself, is testimonial or communicative.  See id. at 210, 108 S. Ct. at 2347.  In addition, DNA collection by police is not interrogation of a suspect because it is not reasonably likely to elicit an incriminating verbal response.  Accordingly, the Florida Supreme Court reasonably concluded that the request for DNA consent— even though it followed Everett's invocation of his right to counsel under Miranda—did not violate his Fifth Amendment rights.[16]

We recognize that Everett argues that once he invoked his right to counsel under Miranda the police were prohibited from having any further communication or dealings with him without counsel present.  The cases relied on by Everett in support of this argument—Edwards, Mosley, Roberson, and Innis—provide no indication, and certainly do not clearly establish, that the Fifth Amendment right to counsel extends beyond interrogation or that police must cease all further communication with a detained individual in the absence of an attorney after he invokes his right to counsel.  Rather, the Supreme Court in these cases consistently

---

[16]To the extent that Everett's contends that service of the arrest warrant constituted interrogation, we summarily conclude that the Florida Supreme Court reasonably determined that the service of the warrant did not amount to interrogation.  Everett I, 893 So. 2d at 1286. Sergeant Tilley's service of the arrest warrant was part of routine police procedure normally attendant to custody, and Tilley would not reasonably have expected service of the arrest warrant to elicit an incriminating response, as a response from Everett was not even required.  Cf. Innis, 446 U.S. at 302, 100 S. Ct. at 1690 (reasoning that a conversation was merely "a dialogue between the two officers to which no response from the [defendant] was invited").

65

held only that <u>interrogation</u> must cease in such circumstances.  <u>Roberson</u>, 486 U.S. at 680-82, 108 S. Ct. at 2097-98; <u>Edwards</u>, 451 U.S. at 484-85, 101 S. Ct. at 1885; <u>Innis</u>, 446 U.S. at 302-03, 100 S. Ct. at 1690-91; <u>Mosley</u>, 423 U.S. at 104 n.10, 96 S. Ct. at 326 n.10.  Indeed, the Supreme Court in <u>Roberson</u> specifically noted that the police officers in that case were free to have communications with the defendant that did not constitute interrogation even after he requested counsel.  <u>See</u> <u>Roberson</u>, 486 U.S. at 687, 108 S. Ct. at 2101.

Contrary to Everett's allegations, there is no record evidence that the police asked Everett any questions about the Bailey homicide when Officer Murphy gave Everett the DNA consent form to sign.  And it was Officer Murphy in Alabama, and not Sergeant Tilley, who gave Everett the DNA consent form to sign.  At oral argument, Everett's counsel stressed that Sergeant Tilley testified in his deposition that, when Tilley asked Officer Murphy to collect Everett's DNA samples, Murphy indicated that he was already planning "to go back and talk to [Everett]" concerning another case unrelated to the Bailey homicide investigation.  However, no record evidence establishes that Murphy actually approached Everett to discuss the unrelated matter or in fact said something to Everett concerning that unrelated

66

matter.  Instead, the record shows only that Murphy approached Everett simply to ask for Everett's consent to provide DNA samples.[17]

In sum, we conclude that the Florida Supreme Court did not unreasonably apply clearly established Supreme Court precedent in determining that a request for consent to collect DNA samples from a defendant in custody who has invoked the right to counsel was not an interrogation, did not procure any testimonial communication, and did not run afoul of Miranda and its progeny.  See Everett I, 893 So. 2d at 1285-87.

## C.    November 27 Confession

The Florida Supreme Court could have also reasonably concluded that the factual circumstances surrounding Everett's November 27 confession did not violate his Fifth Amendment rights.  As noted earlier, Everett invoked his right to counsel on November 14, 2001.  The record shows, however, that on both November 19 and 27 Everett did two things: (1) Everett initiated further discussions with the police officers, and (2) Everett voluntarily, knowingly, and

---

[17]Everett also alleges that because Sergeant Tilley and Lieutenant Lindsey made parting comments to Everett on November 14, those comments should be viewed as continuing interrogation on November 19, even though only Officer Murphy gave Everett the DNA consent form and even though five days had intervened.  There is no Supreme Court case remotely supporting that proposition.

intelligently waived his right to counsel.  See Smith, 469 U.S. at 95, 105 S. Ct. at 492-93; see Moran, 475 U.S. at 421, 106 S. Ct. at 1141.[18]

### 1.    November 19 Statement

Although only the November 27 confession was introduced at trial, Everett focuses on what happened on November 19 before that confession on November 27.  So we do too.  Everett contends that the officers' actions between November 14 and November 27, including the request for consent to collect DNA samples, constituted an ongoing effort to coerce and indirectly interrogate him, ultimately culminating in his November 27 confession.  Therefore, the totality of the circumstances leading up to his November 27 confession was before the Florida Supreme Court and thus is considered here.

The record shows, as an initial matter, that Sergeant Tilley and Lieutenant Lindsey ended the November 14 interview as soon as Everett requested the presence of an attorney.  Consistent with Edwards, the officers did not resume

---

[18]Everett also contends, based on Mosley, 423 U.S. 96, 96 S. Ct. 321, that the police did not "scrupulously honor" his invocation of his right to counsel.  See id. at 96, 96 S. Ct. at 326 ("We therefore conclude that the admissibility of statements obtained after the person in custody has decided to remain silent depends under Miranda on whether his 'right to cut off questioning' was 'scrupulously honored.'").  However, Mosley was a "right to silence" case, and "right to silence" and "right to counsel" cases do not involve identical inquiries.  See Christopher v. Florida, 824 F.2d 836, 844 (11th Cir. 1987).  The invocation of the right to counsel requires the police to cease interrogation until an attorney is present or the suspect voluntary reinitiates questioning, Edwards, 451 U.S. at 484-85, 101 S. Ct. at 1885, while invocation of the right to silence does not prevent the police from later reinitiating questioning as long as they "scrupulously honored" the suspect's right to remain silent, Mosley, 423 U.S.at 104, 96 S. Ct. at 326.  Nothing in Mosley shows the Florida Supreme Court's decision was an unreasonable application of clearly established federal law.

questioning of Everett until after Everett both voluntarily initiated further discussion and voluntarily waived his previously invoked right to counsel.  See Smith, 469 U.S. at 95, 105 S. Ct. at 492-93.

Specifically, as to Everett's initiation of further police communications, there is no allegation (much less evidence) of improper police contact between November 14 and 19.  Then, on November 19, Everett told Officer Murphy that he wished to provide a name to point Sergeant Tilley in the right direction.  After Officer Murphy immediately advised Everett of his Miranda rights orally and in writing, Everett again clearly stated that he wished to offer further information and would give a statement to either Officer Murphy or Sergeant Tilley.

We recognize that Officer Murphy initiated contact with Everett on November 19 to request consent for the DNA collection, but this non-interrogatory contact did not run afoul of Edwards, as discussed supra, and does not change the fact that Everett himself initiated his November 19 statement about pointing Sergeant Tilley in the right direction.  And, before taking his November 19 statement in that regard, Officer Murphy again read Everett his Miranda rights, and Everett stated that he understood his rights and was willing to speak with Murphy.  Moreover, during his November 19 statement, Everett clearly was attempting to point Sergeant Tilley in the direction of Bubba as the killer to exculpate himself.

Significantly too, Officer Murphy and Sergeant Tilley immediately ended the November 19 interview as soon as Everett requested counsel.

As to Everett's waiver of his right to counsel (right before he made the November 19 statement), the state court record amply shows that Everett both voluntarily waived this right and voluntarily made his November 19 statement. First, as detailed above, the officers repeatedly advised Everett of his Miranda rights prior to taking his November 19 statement. Second, in his November 19 statement, Everett indicated that it was a conversation with his mother, and not any pressure from police, that prompted him to make the statement to "get it off [his] chest." Third, the fact that aspects of the November 19 statement were exculpatory, in that Everett suggested that Bubba was the killer and provided an explanation for the presence of his DNA on the victim, further suggests that Everett volunteered the statement. Cf. Burbine, 475 U.S. at 421, 106 S. Ct. at 1141 (holding that courts must consider the "totality of the circumstances" in determining whether a defendant's waiver of his right to counsel was voluntarily (quotation omitted)).

Finally, and importantly, a significant period of time, around five days, elapsed between Everett's November 14 invocation of his right to counsel and his initiation of the November 19 statement, giving Everett time to have rationally reflected on the choice before him. Cf. id. And to repeat, in the district court,

70

Everett pointed to no evidence in the record before the Florida Supreme Court demonstrating that he was subjected to interrogation or other improper police pressure between his November 14 invocation of his right to counsel and his initiation of further communication with police on November 19.[19]  In other words, the record does not show that the officers engaged in any of the "techniques of persuasion" that concerned the Miranda Court.  See Innis, 446 U.S. at 299, 100 S. Ct. at 1688-89.  In particular, requesting a DNA sample and service of an arrest warrant are routine police practices and not psychological ploys of persuasion.

    2.      November 27 Statement

The state court record also amply shows that Everett initiated his November 27 confession and knowingly and voluntarily waived his right to counsel a second time.  With regard to Everett's initiation of the November 27 confession to Sergeant Tilley, Everett told Officer Murphy that he wished to speak with Sergeant Tilley before Tilley even arrived with the arrest warrant.  After Sergeant Tilley served the arrest warrant on Everett, Everett confirmed that he wished to talk to

---

[19]We decline to consider for the first time on appeal Everett's argument, which he failed to properly raise in the district court, concerning Sergeant Tilley and Lieutenant Lindsey's "good cop-bad cop" routine and their comments on November 14 that the murder was likely just a "burglary that went bad" and about "the State of Florida stick[ing] a needle in [his] arm."  See Mason v. Allen, 605 F.3d 1114, 1120 n. 3 (11th Cir. 2010) (concluding that arguments raised for the first time on appeal are waived).  Although in the district court Everett raised an argument concerning Lindsey's statement about "the State of Florida stick[ing] a needle in [his] arm" with regard to another claim not within the scope of the COA, he did not raise it in connection with the present claim.

Tilley.  Even if Officer Murphy made the initial contact with Everett to move him to an interview room for Sergeant Tilley's service of the arrest warrant, it was Everett who initiated further communication regarding his case.

The record also demonstrates the voluntariness of Everett's November 27 statement and waiver of his right to counsel.  Most notably, Everett confirmed at the beginning of his November 27 statement that he had asked to speak to Sergeant Tilley without the presence of a lawyer.  Nonetheless, Sergeant Tilley then reminded Everett again that he still had his rights under Miranda, and Everett indicated that he understood.  Furthermore, more than a week had passed between Everett's invocation of his right to counsel on November 19 and his initiation of his confession on November 27.  And Everett indicated that it was his own conscience, and not any improper pressure on the part of the police, that motivated him to confess, as he stated that the victim's death "ha[d] been going through [his] mind."  Indeed, Everett's willingness to speak to the police was evidenced by the fact that he started confessing before Tilley even had a chance to turn on the tape recorder.

We also reject Everett's argument that the Florida Supreme Court unreasonably rejected his Fifth Amendment claim because the DNA request and warrant service were "indirect interrogation" techniques that the police should have known were likely to elicit his verbal incriminating confession.  The record

72

here shows just the opposite. For example, Everett told Officer Murphy he wanted to speak to Sergeant Tilley even before Tilley arrived with the arrest warrant. In any event, as noted, requesting the DNA samples and serving the arrest warrant are not police techniques designed to elicit a confession.

For all of the foregoing reasons, we conclude that there was a reasonable basis for the Florida Supreme Court's decision affirming the denial of Everett's motion to suppress as to the November 27 confession. The record established that (1) the officers did not subject Everett to interrogation prior to, or in connection with, either the request for consent to collect DNA samples or the service of the arrest warrant; (2) that Everett voluntarily initiated both interviews; and (3) that Everett knowingly and voluntarily waived his right to counsel.[20] Because the Florida Supreme Court's decision is not contrary to or an unreasonable application of clearly established federal law, or the result of an unreasonable determination of the facts, Everett is not entitled to habeas relief on his Fifth Amendment claim.

In conclusion, as to both the DNA consent and November 27 confession, Everett has not established that the ruling of the Florida Supreme Court "was so lacking in justification that there was an error well understood and comprehended

---

[20]The Florida trial court made these explicit findings in denying Everett's motion to suppress and the record fully supported them. The Florida Supreme Court's decision discussed the DNA issues extensively but more summarily ruled on the November 27 confession issue. Instead of deferring to the reasoning of the Florida Supreme Court, we ask whether there was any reasonable basis for the Florida Supreme Court's decision as to the November 27 confession. See Harrington, 562 U.S. at ___, 131 S. Ct. at 784.

in existing law beyond any possibility for fairminded disagreement." Harrington, 562 U.S. at ___, 131 S. Ct. at 786-87.

## VIII.  INEFFECTIVE ASSISTANCE OF COUNSEL IN PENALTY PHASE

### A.    The Strickland Standard

Everett's next claim is that his trial counsel rendered ineffective assistance in the investigation and presentation of mitigating evidence during his penalty-phase trial.  The Florida Supreme Court applied the Supreme Court's two-pronged test announced in Strickland to this claim.  Under Strickland, to establish constitutionally ineffective counsel, a defendant must show both (1) that his attorney's performance was deficient and (2) that the deficient performance prejudiced the defense.  Wiggins v. Smith, 539 U.S. 510, 521, 123 S. Ct. 2527, 2535 (2003) (discussing Strickland); Strickland, 466 U.S. at 687, 104 S. Ct. at 2064.  Because we must view Everett's ineffective-assistance claim—which is already governed by the deferential Strickland test—through the lens of AEDPA deference to the Florida Supreme Court's decision, our resulting standard of review is doubly deferential to that state court's decision.  See Harrington, 562 U.S. at __, 131 S. Ct. at 788 ("The standards created by Strickland and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." (citations omitted)).

### B.    Performance Prong Principles

74

The Strickland performance standard is objectively reasonable attorney conduct under prevailing professional norms. Wiggins, 539 U.S. at 521, 123 S. Ct. at 2535; Strickland, 466 U.S. at 688, 104 S. Ct. at 2065 ("The proper measure of attorney performance remains simply reasonableness under prevailing professional norms."). We look at what professional norms existed at the time that the attorney acted. See Porter v. McCollum, 558 U.S. 30, 39, 130 S. Ct. 447, 452 (2009). To show that an attorney failed to discharge his Sixth Amendment duty, a petitioner must establish that the attorney's conduct "amounted to incompetence under 'prevailing professional norms.'" Harrington, 562 U.S. at ___, 131 S. Ct. at 788 (quoting Strickland, 466 U.S. at 690, 104 S. Ct. at 2066). A petitioner bears the burden of proving, by a preponderance of competent evidence, that counsel's performance was unreasonable. See Strickland, 466 U.S. at 687, 104 S. Ct. at 2064; see also Harrington, 562 U.S. at ___, 131 S. Ct. at 790 ("Strickland . . . calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind.").

Because it would be "all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable . . . a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689, 104 S. Ct. at 2065.

75

Under the professional standards in place in 2002, when trial counsel represented Everett, a defense attorney in a capital case had a duty "to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary," and to present at sentencing mitigating evidence uncovered during that investigation. Strickland, 466 U.S. at 691, 104 S. Ct. at 2066; see also Williams v. Taylor, 529 U.S. 362, 395-98, 120 S. Ct. 1495, 1514-15 (2000) (counsel's performance was deficient because counsel "did not fulfill their obligation to conduct a thorough investigation of the defendant's background"). An attorney's strategic choices "made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." Strickland, 466 U.S. at 690, 104 S. Ct. at 2066. However, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Id. at 690-91, 104 S. Ct. at 2066.

"In assessing the reasonableness of an attorney's investigation, . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." Wiggins, 539 U.S. at 527, 123 S. Ct. at 2538.

That said, no absolute duty exists to investigate particular facts or a certain line of defense. Instead, a court's assessment of an attorney's investigation hinges

on whether that investigation—or the decision to limit it—was reasonable. Strickland, 466 U.S. at 691, 104 S. Ct. at 2066. When assessing an attorney's decision to limit an investigation, we must make "every effort . . . to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id. at 689, 104 S. Ct. at 2065.

Although we must assess a decision not to investigate "for reasonableness in all the circumstances," when doing so we apply "a heavy measure of deference to counsel's judgments." Id. at 691, 104 S. Ct. at 2066. We keep in mind that a defense attorney preparing for the sentencing phase of a capital trial is not required "to scour the globe on the off chance something will turn up." Rompilla v. Beard, 545 U.S. 374, 382-83, 125 S. Ct. 2456, 2463 (2005). Rather, "reasonably diligent counsel may draw a line when they have good reason to think that further investigation would be a waste." Id. at 383, 125 S. Ct. at 2463.

## C.   Performance of Everett's Trial Counsel

After considering the state court record as a whole, we conclude that the Florida Supreme Court's decision—that Everett had not proven that trial counsel's investigation and presentation of mitigation evidence were deficient performance—was not contrary to, or an unreasonable application of, Strickland and its progeny. In this appeal, Everett raises three main arguments concerning

trial counsel's performance as to mitigation evidence, but none of these arguments shows that the Florida Supreme Court unreasonably applied Strickland or its progeny.

### 1.    Investigation of Mitigation Evidence

Everett first contends trial counsel failed to conduct a reasonable mitigation investigation because counsel delegated the task of locating mitigation evidence to his alcoholic father, Sidney; "did nothing" when Sidney passed away several months before trial; and unreasonably limited the scope of counsel's investigation. But the Florida Supreme Court expressly determined that trial counsel did not simply rely on Sidney to develop mitigation evidence and did in fact interview potential mitigation witnesses following Sidney's death. Everett II, 54 So. 3d at 479. Overwhelming record evidence supports the Florida Supreme Court's determination.

For example, trial counsel prepared for the possibility of a capital penalty phase from the time of his initial appointment to represent Everett. During his investigation, trial counsel and his investigator, both before and after Sidney's death, among other tasks: (1) met with Everett multiple times to obtain Everett's background information and the names of potential mitigation witnesses; (2) spoke with one of Everett's sisters over the telephone about possibly testifying during the penalty phase; (3) traveled to Alabama to locate potential mitigation witnesses and

then interviewed all they found; (4) obtained Everett's school and jail records; and (5) spoke with Everett's principal and guidance counselor, his close friend growing up, one of his sisters and her husband, and another family friend. Trial counsel also had Dr. Rowan conduct a competency evaluation of Everett.

Although trial counsel's initial strategy was to rely on Sidney to find mitigation witnesses, trial counsel did not abandon his mitigation investigation after Sidney's death. Instead, trial counsel and his investigator undertook to locate and interview all mitigation witnesses they could find, as described above. Trial counsel also did not limit his investigation to only Everett's redeeming qualities, as Everett suggests. Rather, the record demonstrates that trial counsel reasonably stopped his investigation only after he kept running into "dead ends" and determined that no further helpful mitigation evidence was likely to be forthcoming. See Strickland, 466 U.S. at 691, 104 S. Ct. at 2066; Rompilla, 545 U.S. at 383, 125 S. Ct. at 2463. It cannot be said that the Florida Supreme Court's decision was unreasonable, especially because "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Strickland, 466 U.S. at 691, 104 S. Ct. at 2066.

2.    Psychological or Psychiatric Expert

79

Everett next contends that trial counsel performed deficiently in failing to have a psychological or psychiatric expert conduct a mental health evaluation of him for mitigation purposes. As the Florida Supreme Court determined, Everett's claim that trial counsel failed to consult with a psychological or psychiatric professional is factually incorrect because trial counsel had Dr. Rowan examine Everett for mental competency but decided that any further evaluation of Everett would be unfavorable to his case. See Everett II, 54 So. 3d at 482.

Even if trial counsel Smith had Dr. Rowan examine Everett for competency only as a formality, as Everett insists, Smith reasonably declined to pursue additional mental health evaluation of Everett when Dr. Rowan reported that Everett showed "no signs of mental retardation or of a major illness" and advised against "a full Competence evaluation." In addition, trial counsel Smith was a very experienced attorney in capital cases. Smith reasonably feared that additional mental health evidence actually would be unfavorable to Everett's case, as he believed Everett had antisocial personality disorder and Dr. Rowan found that Everett exhibited a grandiosity and over-confidence that were likely a combination of immaturity, denial, and personality. The Florida Supreme Court's decision rejecting Everett's ineffective-assistance claim about mental health evaluations was a reasonable application of Strickland. At a minimum, the Florida Supreme Court did not unreasonably apply any clearly established federal rule when it

80

concluded that trial counsel Smith's performance was not deficient as to mental health mitigation evidence.

3.    Drug Use

Finally, Everett asserts that trial counsel should have presented evidence of his drug use through a mental health expert. As an initial matter, this is not a case in which trial counsel failed to uncover or investigate drug use. Rather, the record amply supports the Florida Supreme Court's determination that trial counsel learned of Everett's drug use and adequately investigated it. See Everett II, 54 So. 3d at 484. Everett reported his history of drug use, both directly to trial counsel and through counsel's investigator, and trial counsel attempted to corroborate Everett's claim that he was "tripping on acid" at the time of the murder, including by interviewing Jared Farmer. However, trial counsel could find no evidence to corroborate Everett's "tripping on acid" claim and reasonably found it to be inconsistent with the circumstances of the murder.

Furthermore, trial counsel did in fact present evidence of Everett's drug use in mitigation through the testimonies of Everett's mother and sister. Most notably, Everett's mother testified that Everett likely first turned to drugs to block out bad memories of his father and that he would never have committed the murder if not for his drug use. Thus, even though trial counsel did not present evidence of Everett's drug use through a mental health expert, the jury heard about Everett's

81

drug use.  Given the record evidence, we cannot say that the Florida Supreme

Court unreasonably held that trial counsel did not perform deficiently in either his

investigation or his presentation of Everett's drug use in mitigation.  Indeed, as to

Everett's drug use, the Florida Supreme Court reasonably observed that "[m]ore is

not necessarily better."  Everett II, 54 So. 3d at 485 (quotation omitted).

## D.    Prejudice Prong Principles

Even assuming that trial counsel's pre-trial investigation and presentation of

mitigation evidence were deficient, we conclude that the Florida Supreme Court's

decision that Everett failed to show prejudice was not contrary to, or an

unreasonable application of, clearly established federal law.

For prejudice, the standard is whether "there is a reasonable probability that,

but for counsel's unprofessional errors, the result of the proceeding would have

been different."  Strickland, 466 U.S. at 694, 104 S. Ct. at 2068.  To satisfy the

prejudice prong, the "likelihood of a different result must be substantial, not just

conceivable."  Harrington, 562 U.S. at ___, 131 S. Ct. at 792.  "Counsel's errors

must be so serious as to deprive the defendant of a fair trial, a trial whose result is

reliable."  Id. at ___, 131 S. Ct. at 787-88 (quotation omitted).

Because Everett alleges ineffective assistance in the penalty phase, he must

show that "there is a reasonable probability that, absent the errors, the sentencer

. . . would have concluded that the balance of aggravating and mitigating

82

circumstances did not warrant death." Strickland, 466 U.S. at 695, 104 S. Ct. at 2069.  In assessing whether there is a reasonable probability of a different result, "we consider the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—and reweigh it against the evidence in aggravation." Porter, 558 U.S. at 41, 130 S. Ct. at 453-54 (quotation omitted and alteration adopted); see also Wong v. Belmontes, 558 U.S. 15, 26, 130 S. Ct. 383, 390 (2009) ("[T]he reviewing court must consider all the evidence—the good and the bad—when evaluating prejudice.").

## E.    Everett's Prejudice Claim

We conclude that the Florida Supreme Court also reasonably determined that Everett had failed to establish the prejudice requirement of his ineffective counsel claim.  Three reasons support our conclusion.

### 1.    Cumulative Evidence

First, the Florida Supreme Court reasonably concluded that the evidence presented during Everett's post-conviction evidentiary hearing was largely cumulative to the evidence presented during his penalty phase trial.  See Everett II, 54 So. 3d at 480, 484-85; see also Belmontes, 558 U.S. at 22, 130 S. Ct. at 387 (reasoning that some of the evidence that the defendant argued his trial counsel should have presented at sentencing was "merely cumulative" of the evidence that counsel actually presented and that "adding it to what was already there would

have made little difference"). As to Everett's childhood and upbringing, the testimony of his mother and sisters showed both at trial and during the post-conviction phase that Everett's father was an alcoholic and had not always acted appropriately toward Everett; Everett experienced difficulties as a result of his family's frequent moves and his parents' divorce, remarriage, and second divorce; and Everett was loving and non-violent as a child. Indeed, the trial court found Everett's family background was a statutory mitigating circumstance, noting that although his childhood could not be considered a "deprived one," his "upbringing" was not "ordinary." Some of the post-conviction evidence of Everett's drug use was also cumulative. During the post-conviction evidentiary hearing, Everett's mother and sister offered the same nonspecific testimony that Everett had a history of drug use that was offered during the penalty phase hearing.

2.    Unpersuasive Non-Cumulative Evidence

As to prejudice, Everett relies heavily on Dr. Mhatre's testimony in the post-conviction phase. While some of his testimony was covered at the penalty phase, Dr. Mhatre admittedly provided more specific, detailed testimony about Everett's drug use and the resulting paranoia at the time of the crimes than was offered at trial. Yet, to the extent that Dr. Mhatre offered non-cumulative testimony, the Florida Supreme Court reasonably determined that Everett failed to show a reasonable probability of a different result with Dr. Mhatre's testimony. See

84

Everett II, 54 So. 3d at 482-83.  Dr. Mhatre's testimony was speculative and unpersuasive because he conceded that he was not able to corroborate Everett's claim that he was in a drug-induced psychosis at the time of the murder through police officers' reports or other witnesses.  Furthermore, drug use evidence can act as a "two-edged sword," and additional evidence of Everett's drug use at the time of the murder would not necessarily have been favorable to him.  See Cullen v. Pinholster, 563 U.S. ___, ___, 131 S. Ct. 1388, 1410 (2011) (recognizing that evidence of addiction can be mitigating, but also can have aggravating aspects).

And, in any event, even without Dr. Mhatre's testimony, the jury heard Everett's claim that he was "tripping on acid" at the time of the murder through the admission of Everett's November 27 confession.  Indeed, the trial court considered Everett's claim that he committed the murder while under the influence of a hallucinogenic drug and rejected it as inconsistent with the factual circumstances of Everett's crimes and his ability to accurately recall the details of Bailey's house and her murder.  Everett admitted he left the motel with a fish bat and went out looking for money—all intentional and controlled behavior.  The Florida Supreme Court reasonably concluded that there was not a reasonable probability that Dr. Mhatre's uncorroborated testimony would have changed the state trial court's finding as to this mitigating circumstance.  See Everett II, 54 So. 3d at 482-83.

       3.       Strength of the Aggravating Factors

Third, given the powerful strength of the aggravating factors in this case, the Florida Supreme Court reasonably decided that Everett did not show a reasonable probability that his proposed mitigation evidence would be strong enough to outweigh them. As the Florida Supreme Court reasoned, "the evidence in the record indicates that the mitigating evidence presented during the postconviction evidentiary hearing would not alter the balance of aggravation and mitigation." Everett II, 54 So. 3d at 482. The state trial court found as statutory aggravating circumstances that the murder: (1) was committed while Everett was under a sentence of imprisonment for a previous felony conviction; (2) was committed while Everett was engaged in the commission of a sexual battery or a burglary; and (3) was especially heinous, atrocious, or cruel. With regard to the latter two circumstances, the evidence showed that Everett entered Bailey's home, severely beat her and broke her neck, and raped her as she slowly lost consciousness and suffocated to death. Thus, with the strength of the aggravating circumstances and the relative weakness of the scant non-cumulative evidence presented in Everett's post-conviction hearing, the Florida Supreme Court reasonably determined that there was not a reasonable probability that Everett would have received a life sentence had his proposed additional evidence been presented. Cf. Belmontes, 558 U.S. at 20, 130 S. Ct. at 386 ("[T]o establish prejudice, [the petitioner] must show a reasonable probability that the jury would have rejected a capital sentence after it

86

weighed the entire body of mitigating evidence . . . against the entire body of aggravating evidence.").

## IX.  CONCLUSION

For the reasons set forth above, we affirm the district court's denial of Everett's § 2254 petition.

**AFFIRMED.**